UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
C.R. & A.R., individually and on behalf of L.R.,           :

                              Plaintiffs,        :
                                                             15 CV 3051 (ER)
              -against-                          :
                                                             ECF Case
                                                 :
THE NEW YORK CITY DEPARTMENT OF
EDUCATION,                                       :
                              Defendant.
------------------------------------------------------------- X


# MEMORANDUM OF LAW IN SUPPORT OF
# MOTION FOR SUMMARY JUDGMENT

KIRA I. EPSTEIN
Law Offices of Lauren A. Baum, P.C.
61 Broadway, Suite 1060
New York, New York 10006
(212) 644-4414
kepstein@nyspecialedlaw.com

## TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

STATUTORY FRAMEWORK AND BURDEN OF PROOF . . . . . . . . . . . . . . . . . . . . . . . . . . .1

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

    1.    The April 29, 2010 CSE Meeting and IEP . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    2.    The Recommended Public School Placement . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    3.    L.R.'s Unilateral Placement at Cooke . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    I.    THE SRO APPLIED AN INAPPROPRIATE STANDARD OF REVIEW . . . . . 10

    II.    THE SRO ERRED IN CONCLUDING THAT DEFENDANT OFFERED
        L.R. A PROCEDURALLY AND SUBSTANTIVELY APPROPRIATE IEP . . . 11

        A.    A Preponderance of the Evidence Fails to Support the SRO's Finding
              that the IEP Was Procedurally Adequate . . . . . . . . . . . . . . . . . . . . . . . .11

            1.    The CSE Failed to Fully Evaluate L.R. or to Consider
                 Sufficient, Appropriate, Evaluative Material in Developing
                 His IEP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            2.    The CSE Was Invalidly Constituted. . . . . . . . . . . . . . . . . . . . . . . 17

        B.    A Preponderance of the Evidence Fails to Support the SRO's Finding
              that the IEP was Substantively Adequate. . . . . . . . . . . . . . . . . . . . . . . .20

    III.    DEFENDANT FAILED TO SUSTAIN ITS BURDEN OF PROOF
         BECAUSE IT FAILED TO SHOW THAT PS 151 WAS CAPABLE OF
         APPROPRIATELY IMPLEMENTING L.R.'S IEP . . . . . . . . . . . . . . . . . . . . . 26

        A.    The SRO Erroneously Construed the Scope of Defendant's Burden of
              Proof With Regard To The Appropriateness Offered Placement . . . . . . .26

B.    PS 151 Was Inappropriate for L.R. and Would Have Been Unable To Implement His IEP. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

IV.    COOKE APPROPRIATELY ADDRESSED L.R.'S NEEDS FOR THE 2010-2011 SY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

IV.    EQUITABLE CONSIDERATIONS SUPPORT PLAINTIFFS' CLAIM AND THEY QUALIFY FOR DIRECT FUNDING OF L.R.'S TUITION . . . . . . . . . 33

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

## TABLE OF AUTHORITIES

<u>Cases</u>

A.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.,
    553 F.3d 165 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

A.M. v. New York City Dep't of Educ.,
    964 F. Supp. 2d 270 (S.D.N.Y. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

Bd. of Educ. v. Rowley,
    458 U.S. 176 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

B.R. v. New York City Dep't of Educ.,
    910 F. Supp. 2d 670 (S.D.N.Y 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 28, 32

C.B. v. New York City Dep't of Educ.,
    No. 02 Civ. 4620, 2005 U.S. Dist. LEXIS 15215 (E.D.N.Y. June 10, 2005) . . . . . . . . . 4

C.F. v. New York City Dep't of Educ.,
    746 F.3d 68 (2d Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2, 3, 11

C.L. v. New York City Dep't of Educ.,
    No. 12 Civ. 1676, 2013 U.S. Dist. LEXIS 3474, (S.D.N.Y. Jan. 2, 2013),
    aff'd 552 Fed. Appx. 81 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

C.L. v. Scarsdale Union Free School District,
    744 F.3d 826 (2d Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

C.U. v. New York City Dep't of Educ.,
    2014 U.S. Dist. LEXIS 72075 (S.D.N.Y. May 27, 2014). . . . . . . . . . . . . . . . . . . . . . . 3

D.C. v. New York City Dep't of Educ.,
    950 F. Supp. 2d 494 (S.D.N.Y. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26, 27, 28, 31

E.M. v. New York City Dep't of Educ.,
    758 F.3d 442, 453 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

F.B. v New York City Dep't of Educ.,
    No. 14 Civ. 3902, 2015 WL 5564446 (SDNY Sep. 21, 2015) . . . . . . . . . . . . . .28, 31, 32

F.O. v. New York City Dep't of Educ.,
    976 F. Supp.2d 499 (S.D.N.Y. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

<u>Forest Grove v. TA,</u>
    557 U.S. 230 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

<u>Frank G. v. Bd. of Educ. of Hyde Park,</u>
    459 F.3d 356 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 33

<u>Gagliardo v. Arlington Cent. Sch. Dist.,</u>
    489 F. 3d 105 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 32

<u>Jennifer D. v. New York City Dep't of Educ.,</u>
    550 F. Supp. 2d 420 (S.D.N.Y. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

<u>Lillbask v. State of Conn. Dep't of Educ.,</u>
    397 F.3d 77, 83 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 29

<u>M.H. v. New York City Dep't of Educ.,</u>
    712 F. Supp. 2d 125 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . .4, 11, 20, 22

<u>M.H. v. New York City Dep't of Educ.,</u>
    685 F.3d 217 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

<u>M.O. v. New York City Dep't of Educ.,</u>
    No. 14-1473, 2015 U.S. App. LEXIS 12161 (2d Cir. July 15, 2015). . . . . . . . . . . . 27, 28

<u>Mr. and Mrs. A. v. New York City Dep't of Educ.,</u>
    769 F. Supp. 2d 403 (S.D.N.Y. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1, 33

<u>R.E. v. New York City Dep't of Educ.,</u>
    694 F.3d 167 (2d Cir. 2012),
    <u>cert. denied,</u> 133 S.Ct. 2802 (2013) . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 10, 11, 20, 26, 27, 31

<u>R.K. v. New York City Dep't of Educ.,</u>
    09 CV 4478, 2011 U.S. Dist. LEXIS 32248 (E.D.N.Y. Jan. 21, 2011) . . . . . . . . . . . . .16

<u>Sch. Comm. of Burlington v. Dep't of Educ.,</u>
    471 U.S. 359 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

<u>Schreiber v. E. Ramapo Cent. Sch. Dist.,</u>
    700 F. Supp. 2d 529, 547 (S.D.N.Y. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

<u>Scott v. New York City Dep't of Educ.,</u>
    12 Civ. 3558, 2014 U.S. Dist. LEXIS 41238 (S.D.N.Y. Mar. 25, 2014) . . . . . . . . . . . . 27

iv

V.S. v. New York City Dep't of Educ.,
  25 F. Supp. 3d 295 (E.D.N.Y. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

Walczak v. Florida Union Free Sch. Dist.,
  142 F.3d 119 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

W.G. v. Target Range School District,
  960 F. 2d 1479 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

**Statutes**

20 U.S.C. § 1412(a)(10)(C)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

20 U.S.C. § 1412(A)(5)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

20 U.S.C. § 1414 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

20 U.S.C. § 1414(d)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

20 U.S.C. § 1414 (d)(1)(B)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

20 U.S.C. § 1415(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

20 U.S.C. § 1415(i)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

20 U.S.C. § 1415(i)(2)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

N.Y. Educ. L. § 4402(1)(b)(3)(b)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

N.Y. Educ. L. § 4402(b)(1)(a)(vii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

N.Y. Educ. L. § 4404(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

N.Y. Educ. L. § 4404(1)(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 32

C.P.L.R. Art. 7803 . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

**Regulations**

8 N.Y.C.R.R. § 200.1(cc). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

8 N.Y.C.R.R. § 200.1(ww)(3)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

8 N.Y.C.R.R. § 200.3(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

8 N.Y.C.R.R. § 200.3(a)(1)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. 17

8 NYCRR § 200.3(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

8 N.Y.C.R.R. § 200.4(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

8 NYCRR § 200.4(b)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

8 NYCRR § 200.4(b)(6)(vii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

8 N.Y.C.R.R. § 200.4(d)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12, 22

8 N.Y.C.R.R. § 200.4(f)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11, 12

8 N.Y.C.R.R. § 200.6(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

8 N.Y.C.R.R. § 200.6(h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

8 N.Y.C.R.R. § 279.12(a) . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

34 C.F.R. § 300.303(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

34 C.F.R. § 300.305 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

34 C.F.R. § 300.321(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

34 C.F.R. § 300.324 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

34 C.F.R. § 300.324 (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

34 C.F.R. § 324(a)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

34 C.F.R. § 300.344(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

34 C.F.R. § 300.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**Miscellaneous**

Letter to Heldman, 19 IDELR 930 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## PRELIMINARY STATEMENT

Plaintiffs submit this Memorandum in support of their Motion for Summary Judgment.  They seek reversal of the decision of the State Review Officer ("SRO") reversing the thorough and well-reasoned decision of the Impartial Hearing Officer ("IHO") finding that Defendant failed to offer L.R. a free and appropriate public education ("FAPE") for the 2010-11 school year ("SY") and granting Plaintiffs' claim for funding for the cost of their son's attendance at the Cooke Center for Learning and Development ("Cooke") during the 2010-11 SY.  Since the SRO incorrectly applied relevant law, including erroneously construing Defendant's burden of proof with respect to the appropriateness of the public placement offered to L.R. for the 2010-11 SY, the SRO's decision does not warrant deference.  Accordingly, this Court should instead defer to the more well-reasoned decision of the IHO and find that Defendant failed to sustain its burden of showing that it prepared a procedurally and substantively valid IEP and of demonstrating that it offered a public school placement capable of appropriately implementing that IEP and addressing L.R.'s needs for the 2010-11 SY; that Cooke appropriately addressed L.R.'s needs for the 2010-11 SY; and that a weighing of equities supports Plaintiffs' claim for tuition funding.  The Court should find that Plaintiffs are entitled to judgment as a matter of law and grant their Motion for Summary Judgment.

## STATUTORY FRAMEWORK AND BURDEN OF PROOF

If a school district fails to provide a FAPE to a student with a disability, parents may enroll their child in a private school and seek direct tuition funding or reimbursement for the cost of the program. Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 363 (2d Cir. 2006); E.M. v. New York City Dep't of Educ., 758 F.3d 442, 453 (2d Cir. 2014); Mr. and Mrs. A v. New York City

Dep't of Educ., 769 F. Supp. 2d 403, 427 (S.D.N.Y. 2011).  This remedy is available regardless of whether the parent of the student in question has actually availed him or herself of the services offered to the student for the school year in question.  See Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 372 (1985); Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 247 (2009); Frank G., 459 F.3d at 372 (explaining that such a position would "place the parents of children with disabilities in the untenable position of acquiescing to an inappropriate placement in order to preserve their right to seek reimbursement from the public agency").

A two prong test applies to determine whether parents are entitled to funding/reimbursement: (1) was the Individualized Education Program ("IEP") proposed by the school district for the student appropriate; and (2) was the private placement appropriate to meet the student's needs. Burlington, 471 U.S. at 370.  In New York, Defendant has the burden of proof on the first prong, whereas Plaintiff has the burden of proof on the second prong. C.F. v. New York City Dep't of Educ., 746 F.3d 68, 76 (2d Cir. 2014).  "[E]quitable considerations [relating to the reasonableness of the action taken by the parents] are [also] relevant to fashioning relief." Frank G., 459 F. 3d at 363-64 (citation omitted); see also C.F., 746 F.3d at 76; 20 U.S.C. § 1412(a)(10)(C)(iii).

Parents who challenge the educational program developed for their child and wish to exercise their right to place their child in a private school and seek reimbursement may request a due process hearing before an IHO. Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 108 (2d Cir. 2007) (citing 20 U.S.C. § 1415(f); N.Y. Educ. Law § 4404(1)).  In New York, any party aggrieved by an IHO's decision may appeal it to the SRO, see id. at 108, and the SRO's decision may be appealed to state or federal court. See id. (citing 20 U.S.C. § 1415(i)(2)(A)).

2

**STANDARD OF REVIEW**

In evaluating an IDEA case on appeal, the district court must independently review the administrative record *de novo* and "determine by a preponderance of the evidence whether the IDEA's provisions have been met." Jennifer D. v. New York City Dep't of Educ., 550 F. Supp. 2d 420, 429 (S.D.N.Y. 2008) (citation omitted); see also 20 U.S.C. § 1415(i)(2)(C); Gagliardo, 489 F.3d at 112; C.F., 746 F.3d at 77.  The court must give "'due weight' to [the administrative] proceedings" in its review since the "judiciary generally 'lacks the "specialized knowledge and experience necessary to resolve . . . questions of educational policy.'" A.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist., 553 F.3d 165, 171 (2d Cir. 2009) (quoting Gagliardo, 489 F.3d at 113).

The degree of deference owed to the agency determinations below depends upon both the particular issue decided and "the quality of [the] opinion." F.O. v. New York City Dep't of Educ., 976 F. Supp. 2d 499, 511 (S.D.N.Y. 2013) (quoting R.E. v. New York City Dep't of Educ., 694 F.3d 167, 189 (2d Cir. 2012), cert. denied, 133 S.Ct. 2802 (2013)).  The deference due generally "hinge[s] on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based upon substantially greater familiarity with the evidence and the witnesses than the reviewing court." C.U. v. New York City Dep't of Educ., 23 F.3d 210, 223 (S.D.N.Y. May 27, 2014) (citing C.L. v. Scarsdale Union Free Sch. Dist., 744 F.3d 826, 838 (2d Cir. 2014)).  More deference is due to administrative findings on issues involving educational judgment, such as "determinations regarding the substantive adequacy of an IEP," than to findings on issues involving more objective assessments, such as "whether the IEP was developed according to the proper procedures." M.H. v. New York City Dep't of Educ., 685 F.3d 217, 244 (2d Cir. 2012) ("[T]he district court's

determination on the persuasiveness of an administrative finding must also be colored by an acute awareness of its own institutional competence.").  However, no deference is due to administrative interpretations of law, see Lillbask v. State of Conn. Dep't of Educ., 397 F.3d 77, 83 (2d Cir. 2005), and the "'[c]ourt may reject factual findings that are unsupported . . . or are controverted by the record.'" Schreiber v. E. Ramapo Cent. Sch. Dist., 700 F. Supp. 2d 529, 547 (S.D.N.Y. 2010) (quoting C.B. v. New York City Dep't of Educ., No. 02 Civ. 4620, 2005 U.S. Dist. LEXIS 15215, at *13 (E.D.N.Y. June 10, 2005)).  Furthermore, the Second Circuit has been clear that a court should reject agency findings that are not "grounded in 'thorough and careful' analysis" and "supported by a preponderance of the objective evidence." M.H., 685 F.3d at 246; see also R.E., 694 F.3d at 189.

Although a reviewing court typically should defer to the SRO in cases where the decisions of the SRO and IHO conflict, the Second Circuit has held that it is "entirely appropriate for the court . . . to consider the IHO's analysis" when it finds that the SRO's decision is "'insufficiently reasoned to merit deference." See R.E., 694 F.3d at 189 (quoting M.H., 685 F.3d at 246); C.L. v. New York City Dep't of Educ., No. 12 Civ. 1676, 2013 U.S. Dist. LEXIS 3474, at *20-21 (S.D.N.Y. Jan. 2, 2013), aff'd 552 Fed. Appx. 81 (2d Cir. 2014) (deferring to the IHO's more reasoned analysis where the SRO failed to grapple with contradictory evidence or to set forth the basis for his conclusions); see also M.H. v. New York City Dep't of Educ., 712 F. Supp. 2d 125, 154-55 (S.D.N.Y. 2010), aff'd 685 F.3d 217 (2d Cir. 2012) (reversing the SRO where he ignored evidence that was considered by the IHO); F.O., 976 F. Supp. 2d at 513-18 (reversing the SRO for "fail[ing] to consider thoroughly or carefully contrary testimony" and for failing to set for the basis for rejecting IHO credibility findings); B.R. v. New York City Dep't of Educ., 910 F. Supp. 2d 670, 677-78 (S.D.N.Y 2012)

4

(reversing "conclusory assertions" of the SRO lacking supporting analysis and deferring to the IHO's more reasoned analysis).   Similarly, if the reviewing court finds the decisions of both the SRO and IHO to be inadequately reasoned on particular issues, then it should defer to neither decision.   See, V.S. v. New York City Dep't of Educ., 25 F. Supp. 3d 295, 299-301 (E.D.N.Y. 2014).

## STATEMENT OF FACTS

L.R. is a student with autism. (Tr. 493, 520; Ex. 4-1.)[1]   While of average cognitive ability, he has fine motor, speech/language, attentional, and communication deficits, which negatively affect his performance in the classroom. (Tr. 113, 200, 205-06, 225-26, 375-76, 494, 573; Ex. 4, 9, G, H, I, P, Q.) During the 2010-11 SY, L.R. had sensory issues, including particular sensitivity to loud and noisy environments, had difficulty self-regulating, became highly anxious with changes in routine, and had difficulty with transitions. (Tr. 225-29, 375-77, 395, 418-19, 432-34, 573; Ex. 9, G, H, I, P, Q.)   He had impaired social and pragmatic language skills, struggled with reciprocal social interaction, was anxious, and had trouble interacting appropriately with his peers and sustaining eye contact with others. (Tr. 225-29, 376, 434-35, 573-74; Ex. 9, G, H, I, P, Q.)   As a result of these issues, L.R. required frequent prompting and redirection and frequent breaks in order to stay on task and complete tasks and to re-engage him when he lost focus. (Tr. 226, 252-54, 273, 377, 384, 400; Ex. 9, G, H, I, P, Q.)  L.R. also required placement in a small class in a small, structured, supportive educational environment, with significant levels of individual attention, specialized learning support, and appropriate teaching methodologies to address his unique needs, with appropriate peers and peer

---

[1]Citations to "Tr." refer to pages of the transcript of the underlying impartial hearing in this case. Citations to "Ex." followed by a letter or number refer to the parties' exhibits from the underlying impartial hearing in this case.  Finally, citations to "IHO Ex." refer to exhibits entered into the record by the IHO in the underlying impartial hearing.

5

models for language, socialization, and behavior, and with appropriate levels of speech and language ("SL") therapy, occupational therapy ("OT"), and counseling, provided through a coordinated approach during his school day.  (Ex. I.)

1.      The April 29, 2010 CSE Meeting and IEP

The CSE met on April 29, 2010 to develop an IEP for L.R. for the 2010-11 SY.  (Ex. 4.) C.R., along with a friend, Sarah, attended the meeting. (Tr. 576; Ex. 2-3, 4-2.)  No one from L.R.'s then-current school participated in the meeting. (Tr. 576; Ex. 2-3, 4-2.)  For the CSE, Mary Ellen Bizzarri participated as the special education teacher, Diane Bowser participated as the school psychologist, and Tara Napoleoni participated as the general education teacher/District Representative. (Tr. 576; Ex. 2-3, 4-2.)

According to Dr. Bowser, the team reviewed the Child Outcomes Summary Form that was completed by the Committee on Preschool Special Education ("CPSE") when L.R. entered the CPSE in 2009, and then completed an exit summary to see whether L.R. had made progress while he was in the CPSE. (Tr. 107-08.)  However, the team merely placed scores on the summary sheet without completing the detailed exit form of the Child Outcomes Summary Form, so there is no indication in the record or in Dr. Bowser's testimony as to how the team reached its conclusions or what it relied upon in determining the scores that were given, nor did the scores indicate what L.R.'s then-current cognitive, academic or social/emotional functioning levels were. (Ex. 8.)  The team also reviewed a parent survey that was completed by C.R., an OT Evaluation, a physical examination, and Dr. Bowser's Classroom Observation, along with the accompanying Post-Observation Teacher Interview. (Tr. 107-110; Ex. 9, 10, 11, 12, 13.)  Dr. Bowser confirmed that no new or additional cognitive evaluations or achievement tests had been conducted for L.R. since 2008. (Tr. 122, 123,

6

148, 152.)  Moreover, at the CSE review meeting, Dr. Bowser expressed her opinion that L.R. had some autistic features and asked C.R. to fill out a Childhood Autism Rating Scale ("CARS"). (Tr. 105-06, 110-12; Ex. 2-3.)  Dr. Bowser concluded that the results were not reliable because of the type of responses she was getting from C.R, but she did not conduct or request any evaluations to determine whether L.R. was autistic prior to developing his IEP, despite the team's significant suspicions that L.R. was autistic. (Tr. 112, 114, 127, 165, 171; Ex. 2-3.)

The CSE classified L.R. as a student with a speech or language impairment and recommended placement in a 12:1:1 special class in a community school, along with related services of SL, OT, and counseling. (Ex. 4.)  However, during the meeting, Dr. Bowser also suggested that C.R. speak with Nilofer Naqvi, the head of the DOE's NEST Program, an inclusive program for students on the Autism spectrum, and referred L.R.'s case to the NEST Program following the meeting, further confirming the CSE's belief that L.R. was autistic. (Tr. 579, 595, 596, 606; Ex. 15.)  C.R. made L.R. available for an observation and testing by Ms. Naqvi. (Tr. 579, 595, 596, 606; Ex. 15.)  Based upon her assessment, Ms. Naqvi concluded that L.R. was autistic and offered him a seat in an intensive pre-K program for the 2010-11 school year, but not in the NEST Program. (Tr. 579, 593, 594, 595; Ex. 15, E.)  C.R. visited the pre-K program and declined the offer in writing, advising Ms. Naqvi that she was not comfortable with keeping L.R. in a pre-K program for another year in the hope that he might be eligible for the NEST Program the following year. (Tr. 579, 580, 593, 600; Ex. E-1.)  Ms. Naqvi never responded to this letter. (Tr. 580.)

       2.    <u>The Recommended Public School Placement</u>

In June 2012, the parents received a Final Notice of Recommendation ("FNR") offering L.R. a placement in a 12:1:1 special class P.S. 151 for the 2010-11 SY. (Ex. 6.)  C.R. subsequently visited

the school and met with the guidance counselor in order to observe the program, but she was not able to see it because the class did not yet exist and would not be ready until September. (Tr. 580-81, 610-11; Ex. 6, 16.)  She therefore wrote a letter to the CSE advising that the recommended class did not yet exist and that the guidance counselor with whom she had met was unable to provide answers to her questions about the proposed class, asking for information about the program in order to assess whether it would be appropriate for L.R., and advising the CSE that she would visit the placement in September and let the CSE know her decision at that time. (Tr. 581, 596, 597; Ex. C-1, D-1.)  She did not receive a response to this letter. (Tr. 581.)  In August, C.R. sent another letter to the CSE advising it that she had not received the information she had requested, that she was concerned that L.R. would not have a sufficient level of support in a 12:1:1 program, and that L.R. had been privately evaluated by Dr. Georgi Antar. (Tr. 582, 583, 596; Ex. F-1.)  C.R. enclosed a copy of Dr. Antar's report, and she requested that the CSE schedule a meeting to reconsider its recommendations for L.R. in light of Dr. Antar's findings and recommendations.  (Ex. F-1.)  The CSE did not respond to this letter either. (Tr. 583.)

C.R. visited the recommended school placement in September, determined that it would not be appropriate for L.R., and notified the CSE in writing of her reasons for making that determination. (Tr. 586; Ex. G.)  She again requested that the CSE meet to reconsider its recommendations in light of Dr. Antar's evaluation, and enclosed another copy of the evaluation report. (Tr. 586; Ex. G.)  The CSE did not address her concerns or advise her that her understanding of the placement was in error. (Tr. 586.)  The only response the parent received was in the form of the CSE's reconvening an IEP meeting in November 2010, at which time the CSE reclassified L.R. as a student with Autism and recommended a 6:1:1 special class in a specialized school. (Ex. 1; IHO Ex. I, II.)

8

3.    L.R.'s Unilateral Placement at Cooke

Due to the DOE's failure to offer L.R. an appropriate program, Plaintiffs chose to unilaterally place him at Cooke for the 2010-11 SY.  C.R. signed a contract with Cooke in June 2010 to ensure that L.R. had an appropriate school to attend in the event that PS 151 proved to be inappropriate. (Tr. 589.)  The Cooke contract would have allowed C.R. to withdraw L.R. from school without further financial penalty if the DOE had offered L.R. an appropriate public placement for the 2010-11 SY. (Ex. M-2.)

Plaintiffs incurred a financial obligation of $44,500 for L.R.'s enrollment at Cooke for the 2010-11 SY.  (Tr. 589; Ex. K, M.)   Plaintiffs financial circumstances prevented them from paying the Cooke tuition during the 2010-11 SY, as the family's adjusted gross income was only $32,041, and they had no other assets upon which they could draw to pay the tuition obligation owed to Cooke. (Tr. 502-04, 590-91, 625; Ex. O.)

## PROCEDURAL HISTORY

On August 8, 2011, Plaintiffs filed a due process complaint ("DPC") alleging that the DOE had failed to offer L.R. a FAPE for the 2010-11 SY; that the April 29, 2010 IEP was procedurally and substantively inadequate; and that PS 151 would not have been an appropriate placement for L.R., and requesting direct funding of L.R.'s tuition at Cooke. (Ex. A.)  The underlying impartial hearing occurred over nine (9) days.  See Compl. Ex. A.  The IHO issued a detailed and carefully reasoned Decision, finding that Defendant's procedural violations resulted in a substantively inappropriately IEP that led to a denial of FAPE for L.R. for the 2010-11 SY.  See id. at 16-17.  The IHO concluded that the record fully supported the appropriateness of Cooke for L.R. and that equitable factors and the evidence regarding C.R. and A.R.'s limited financial resources supported

9

an award of direct funding for L.R.'s Cooke tuition.  See id. at 17-18.

Defendant appealed the IHO's Decision to the SRO, who overturned the IHO's finding that Defendant had failed to provide L.R. with a FAPE during the 2010-11 SY.  See Compl. Ex. B.  In so ruling, the SRO misconstrued R.E. v. New York City Dep't of Educ., 694 F.3d 167 (2d Cir. 2012) and its progeny, dismissing Plaintiffs' challenges to PS 151 as speculative and irrelevant under R.E. because L.R. had never attended the school, and finding that Defendant had no obligation to show that PS 151 could have implemented L.R.'s IEP. See Compl. Ex. B at 19-21.  While the SRO also claimed to have considered Plaintiffs' challenges to PS 151 "for the sake of argument," she offered no support for her conclusion that "the evidence in the hearing record [did] not support the conclusion that the district" could not have appropriately implemented L.R.'s IEP. See id. at 21.  The SRO rejected the remainder of Plaintiffs' claims with respect to the procedural and substantive inadequacy of the IEP and denied their claim for tuition funding. See id. at 15-19.

## ARGUMENT

## I.    THE SRO APPLIED AN INAPPROPRIATE STANDARD OF REVIEW.

The standard of review applied by the SRO in reviewing the IHO Decision (see 8 N.Y.C.R.R. § 279.12(a)) improperly afforded the IHO no measure of deference, despite the fact that an IHO was in a better position to evaluate the record since he witnessed the presentation of witnesses and evidence. Instead of affording any deference to the IHO, the SRO completely substituted its own judgment for that of the IHO.  This de novo standard of review flies in the face of New York's statutory standard for judicial review of administrative decisions set forth in Article 7803 of the Civil Practice Law and Rules, under which an administrative decision is properly overturned only if it is arbitrary, capricious, or an abuse of discretion, or unsupported by substantial evidence in the record.

10

<u>See</u> CPLR Art. 7803.

## II.   THE SRO ERRED IN CONCLUDING THAT DEFENDANT OFFERED L.R. A PROCEDURALLY AND SUBSTANTIVELY APPROPRIATE IEP.

The record fails to support the SRO's conclusion that the DOE developed a procedurally and substantively appropriate IEP for L.R. for the 2010-11 SY.  In determining whether an IEP was appropriate, the Court must consider "(1) whether the [school board] complied with the procedural requirements of the IDEA, and (2) whether the IEP was 'reasonably calculated to enable the child to receive educational benefits.'" <u>M.H.</u>, 712 F. Supp. 2d at 129-30 (citations omitted).  The DOE has failed to meet its burden of proof on both issues. <u>See</u> <u>C.F.</u>, 746 F.3d at 76.

### A.   <u>A Preponderance of the Evidence Fails to Support the SRO's Finding that the IEP Was Procedurally Adequate.</u>

Procedural violations support claims for tuition funding if they impede a student's right to a FAPE, significantly impede the parent's opportunity to participate in the decision making process, or cause a deprivation of educational benefits. <u>See</u> <u>R.E.</u>, 694 F.3d at 190-91.  "Multiple procedural violations may cumulatively result in the denial of FAPE even if the violations considered individually do not," and even when those procedural violations are minor. <u>Id.</u>  The record fails to support the SRO's rejection of Plaintiffs' procedural challenges to the IEP and the placement offered to L.R. for the 2010-11 SY.

#### 1.   <u>The CSE Failed to Fully Evaluate L.R. or to Consider Sufficient, Appropriate, Evaluative Material in Developing His IEP.</u>

An IEP must be based upon a complete assessment of a student's abilities and needs. 34 C.F.R. §§ 300.4, 300.305, 300.324; 8 N.Y.C.R.R. § 200.4(b), (f)(1).  In developing an IEP, a CSE must consider a student's initial or most recent evaluations; current assessments; strengths; and his

academic, developmental, and functional needs, in addition to parental concerns. 34 C.F.R. §
300.324; 8 N.Y.C.R.R. § 200.4(f)(1).  While the law may not mandate that the information used to
develop a student's IEP come from a particular source, the CSE is nonetheless required to ensure that
it has sufficient evaluative and documentary material to justify its recommendations and goals. See
34 C.F.R. § 300.324(a); 8 N.Y.C.R.R. § 200.4(d)(2).  A review of the record fails to support the
SRO's finding that the information the CSE relied upon in developing L.R.'s IEP was adequate.

　　　　Far from basing L.R.'s IEP upon comprehensive evaluative material, a review of the record
shows that the CSE only considered the entry form of the Child Outcomes Summary Form that was
completed by the CPSE in 2009, a parent survey that was completed by C.R., an OT Evaluation, a
physical examination, and Dr. Bowser's Classroom Observation, along with the accompanying Post-
Observation Teacher Interview. (Tr. 107-10; Ex. 8, 9, 10, 11, 12, 13); see supra Statement of Facts
("Facts") Part 1.  Dr. Bowser confirmed that no new or additional cognitive evaluations or
achievement tests had been conducted for L.R. since 2008, and that the only testing that was relied
on by the CSE in the production of the IEP was the OT Evaluation. (Tr. 120.)  In preparing the
Present Performance section of the Academic Performance page of the 2010 IEP to describe L.R.'s
current academic functioning, Dr. Bowser referred only to this old testing that had been conducted
by the CPSE almost two full years before the April 2010 CSE review meeting. (Tr. 122-23, 148, 152;
Ex. 4-3, 8-3, 8-5, 8-7.)  Moreover, the CSE simply photocopied the Social/Emotional Performance
page from L.R.'s prior CPSE IEP and inserted it in the new IEP it was developing for the 2010-11
SY, without any revision or modification, to describe L.R.'s current social/emotional functioning.
(Tr. 135; Ex. 4-5.)  No updated social/emotional testing of any nature was conducted for L.R.,
despite his difficulties with attention, behavior, frustration tolerance, social skills, and social and

emotional development that are mentioned throughout the OT Evaluation. (Ex. 9.)  Had such testing been conducted by the CSE, L.R.'s anxieties that were "very apparent" and "really hindered his social/emotional growth and development" could have been identified and addressed in the 2010-11 IEP. (Tr. 453, 479.)  Lacking any current testing results or assessments to point to, Dr. Bowser's only response when questioned as to how she came to the conclusion that L.R.'s 2008 testing results and the information in L.R.'s 2009 IEP were still current representations of L.R.'s functioning at the time of the April 2010 IEP meeting was that she had observed "some of the same type of behaviors" when she went to observe L.R. and that as a result she "believed that [the information] was still current." (Tr. 153.)  Considering the brief 50 minute duration of Dr. Bowser's observation of L.R., her observation was clearly an insufficient basis to determine L.R.'s current functioning levels, and her observation of behaviors consistent with the prior testing hardly established that L.R.'s functioning was otherwise similar to his functioning in 2008 across other areas, including cognitive ability, language skills, academic skills, or social skills. (Ex. 11.)  While the remaining description of L.R.'s current academic functioning in the 2010 IEP states that he had difficulty focusing on tasks and required additional assistance, especially when he put on his shoes, this was taken from the partially completed Post-Observation Teacher Interview with L.R.'s teacher and not from any formal assessment. (Tr. 147; Ex. 4-3, 12.)  Thus, the IHO correctly found that the CSE lacked current or accurate information regarding L.R.'s social emotional, cognitive and academic functioning at the time of the April 2010 IEP meeting, and instead relied on "summaries from a prior IEP" of past reports that "the team did not even have in their possession," which was "problematic at best." Compl. Ex. A at 16;  8 NYCRR §§ 200.4(b)(4), 200.4(b)(6)(vii).

In reversing the IHO's finding, the SRO erroneously concluded that the CSE was not required

to evaluate L.R. because a CSE is only required to evaluate a student once every three years. See Compl. Ex. B at 13 n.7. To the contrary, a CSE team is required to reassess a student *if the student's needs so warrant* in order to ensure that it has sufficient information regarding a student's current level of functioning to develop an appropriate IEP. See 34 C.F.R. § 300.303(a)(2); 8 N.Y.C.R.R. § 200.4(b)(4). The IHO properly recognized that there was reason to reassess L.R. in this case in order to develop an appropriate IEP. See Compl. Ex. A at 16. It greatly strains credulity to conclude, as the SRO's finding requires, that L.R.'s functioning in pre-school in 2008 was fully representative of his functioning in 2010 at age five such that there was no need for updated testing and assessments in order to develop his first school-aged IEP. Moreover, as noted, Dr. Bowser's testimony provided no basis to conclude that L.R.'s functioning was consistent with his functioning as measured in pre-school almost two years before the 2010 IEP meeting. See supra.

Indeed, to the contrary, the record shows that the CSE was aware that L.R. was likely on the autism spectrum and yet failed to conduct any updated testing or assessments. Dr. Bowser testified that when she conducted her classroom observation of L.R., she "started thinking that maybe he had autism, that he was somewhere on the spectrum," because of the type of behaviors she had observed that included spinning, perseverative behaviors, withdrawal, reaction to music, and not using language appropriately. (Tr. 98.) She said that at the time she saw L.R., he was exhibiting behaviors similar to "those that [she] typically saw with children who were autistic." (Tr. 54.) At the CSE review meeting, Dr. Bowser expressed her concerns about what she had seen during the observation, indicating her belief that L.R. had some autistic features, and she asked C.R. to fill out a CARS report. (Tr. 105-06, 110-12; Ex. 2-3.) Although Dr. Bowser concluded that the results were not reliable since she had observed that in some instances, L.R.'s behaviors were more severe than C.R.

14

was indicating on the CARS report, (Tr. 112, 114, 165; Ex. 2-3), Dr. Bowser nonetheless testified

that she "felt very strongly that [L.R.] had autism," and that she was also aware that L.R.'s physician

had indicated in the physical examination report submitted to the CSE that L.R. had autism and

developmental delays. (Tr. 112, 165; Ex. 13.)  Ms. Bizzarri, the special education teacher present

at the April 2010 meeting, also expressed concerns at the meeting that L.R. might be autistic. (Tr.

171.)  Thus, despite the CSE's clear awareness that L.R. presented with issues that dictated a need

for further testing in order to fully understand L.R.'s educational needs, the record shows that the

CSE not only failed to consider asking L.R.'s preschool to complete a CARS report, but also failed

to conduct or request any updated evaluations or assessments to confirm its strong belief that L.R.

was autistic prior to developing L.R.'s IEP. (Tr. 127, 165.)

      Furthermore, the record shows that the CSE failed to conduct any updated testing or

assessments simply because it did not want to take the time necessary to assess L.R.

comprehensively.  Dr. Bowser testified that the next level of testing would have been to conduct the

Autism Diagnostic Observation Scale ("ADOS"), but that she was not qualified to administer that

test, and that she did not refer the matter to someone else to conduct the ADOS before completing

L.R.'s IEP because "I didn't know what the outcome of that would be," that "it was my team's

responsibility to make sure that [L.R.] had an appropriate program for September," and that if L.R.

didn't qualify for the NEST Program, which could conduct the ADOS, "he wouldn't have a

program." (Tr. 126, 127.)  She further testified that even if she had asked the parent to obtain a

psychiatric report after the IEP meeting and prior to the start of the school year in the fall, her CSE

team left in June and that she "couldn't take the chance that [L.R.'s IEP might be completed] by

somebody else during the summer" since it was "[her] team, [her] child, [her] responsibility." (Tr.

15

192.)  Dr. Bowser's testimony revealed that the CSE did not want to relinquish the development of

L.R.'s IEP to a different IEP team, causing it to improperly rush through the development of L.R.'s

IEP without adequate evaluations or assessments.

As the IHO properly found, the CSE's failure to perform a complete evaluation and

assessment of L.R.'s needs necessarily resulted in an IEP that failed to fully describe or to address

his needs, resulting in a denial of FAPE. R.K. v. New York City Dep't of Educ., 09 CV 4478, 2011

U.S. Dist. LEXIS 32248, at *56-68 (E.D.N.Y. Jan. 21, 2011).    In reversing, the SRO

mischaracterized the IHO's decision in observing that "[c]ontrary to [his] finding . . . the April 2010

CSE was aware that [L.R.] demonstrated behaviors that were characteristic of an autism spectrum

disorder." See Compl. Ex. B at 13.  The IHO did not find that the CSE was unaware that L.R. likely

had autism; rather, the IHO concluded that, despite the CSE's awareness of this and thus its

awareness that L.R.'s had issues that warranted further evaluation, it failed to order sufficient testing

to confirm or refute these suspicions, a fact that the SRO does not address at all in her decision. See

Compl. Ex. A at 16.  Indeed, the testing that was eventually conducted by Ms. Naqvi, the director

of the NEST Program, over the summer of 2010 confirmed that L.R. was autistic. (Tr. 579, 593-95;

Ex. E; Ex. 15.)

In concluding that the evaluative material before the CSE was adequate, the SRO pointed to

instances throughout the IEP where the IEP took information directly from the documentation

available to the CSE at the time of the April 2010 CSE meeting. See Compl. Ex. B at 9-15.

However, the SRO's analysis missed the mark since it failed to address the fact that the information

contained in those referenced documents was outdated, incomplete, and did not comprehensively

address all of L.R.'s areas of need.  See id.  Therefore, the SRO's reversal of the IHO's well-

16

reasoned conclusion that the CSE failed to fully evaluate L.R. or to consider sufficient, appropriate, evaluative material in developing his IEP does not merit deference by this Court, and the Court should instead defer to the IHO's analysis.

2.     The CSE Was Invalidly Constituted.

To create a procedurally valid IEP, the CSE must ensure that the IEP team is validly constituted such that a true conference is possible. See Letter to Heldman, 19 IDELR 930 (1993) (citing W.G. v. Target Range School District, 960 F. 2d 1479 (9th Cir. 1992)); N.Y. EDUC. LAW § 4402(b)(1)(a)(viii); 8 N.Y.C.R.R. 200.3(a)(1).  The required members of the IEP team must attend the entire IEP meeting unless the parent and local education agency agree that the attendance is unnecessary and the parent consents to the excusal in writing. See 20 U.S.C.§ 1414(d)(1)(B).  The law requires that at least "one special education teacher, or where appropriate, at least one special education provider of such child, participate in the meeting at which the student's IEP is developed." 20 U.S.C. § 1414 (d)(1)(B)(iii); N.Y. Educ. L. § 4402(1)(b)(1)(a); 34 C.F.R. §§ 300.321(a)(3), 300.344(a)(3); 8 N.Y.C.R.R. § 200.3(a)(1)(iii); see also A.M. v. New York City Dep't of Educ., 964 F. Supp. 2d 270, 279-80 (S.D.N.Y. 2013) (finding procedural violation where the student's special education teacher did not participate in the student's IEP meeting).

The record shows that the April 2010 IEP team was invalidly constituted since it did not have a special education teacher present who satisfied the procedural requirements.  Ms. Bizzarri, the special education teacher present at the April 2010 IEP meeting, was not L.R.'s pre-school teacher at the Montessori School, nor was she one of L.R.'s related service providers. (Tr. 100, 135, 136; Ex. 2-3, 4-2.)  Ms. Bizzarri was a special education teacher who taught in an integrated co-teaching program at PS 183, and there is no evidence in the record to indicate that she was likely to teach a

17

12:1:1 self-contained kindergarten class or to implement L.R.'s IEP during the 2010-11 SY. (Tr. 137, 138.)  Although Dr. Bowser's notes from the meeting indicate that L.R.'s pre-school teacher was called during the IEP meeting, Dr. Bowser did not include L.R.'s teacher as a meeting participant, and the attendance sheet on the IEP does not reflect that L.R.'s teacher participated. (Tr. 100; Ex. 2-3, 4-2.)  Moreover, C.R. credibly testified that the only participants in the review meeting were Dr. Bowser, the assistant principal at PS 183 (Tara Napoleoni), Ms. Bizzarri, herself, and a friend who was there for support. (Tr. 576.)

While the SRO properly found that the April 2010 review meeting was invalidly constituted, it erred in concluding that this procedural violation did not rise to the level of a denial of FAPE. See Compl. Ex. B at 9.  The CSE's decision to hold the review meeting without the participation of L.R.'s current pre-school teacher or any of L.R.'s related service providers, and without the participation of a special education teacher who was likely to implement his IEP during the 2010-11 SY, deprived the team of critical information regarding L.R.'s current functioning and of input essential to developing an appropriate IEP for him for the 2010-11 SY.  Since the meeting failed to include anyone from the Montessori School who could explain or describe how L.R. was functioning in the classroom on a daily basis and the level of assistance and support he needed to function and learn in a kindergarten classroom during the 2010-11 SY, or to include anyone who would be responsible for implementing L.R.'s IEP, the review team was necessarily unable to adequately understand L.R.'s needs or to appropriately assess the kind of program L.R. required, including considering which supports, services and modifications would be necessary to enable L.R. to function and make progress in the recommended program.  See 20 U.S.C. § 1412(A)(5)(A); 34 C.F.R. § 324(a)(8); 8 NYCRR §§ 200.1(cc), 200.3(d).  The CSE's failure to ensure the presence of

an appropriate special education teacher at the April 2010 IEP meeting was a significant procedural error that, combined with the lack of sufficient evaluative material, resulted in a substantively inadequate IEP and in a deprivation of FAPE to L.R. See infra Part II.B.

Contrary to the SRO's findings, Dr. Bowser's classroom observation and post-observation teacher interview were not sufficient substitutes for the required teacher's participation, as Dr. Bowser only observed L.R. in his classroom for 50 minutes, and the post-observation teacher interview was limited in scope and did not include any discussion about an appropriate program for L.R. (Tr. 97-99; Ex. 11, 12.) The SRO also erroneously suggested that the participation of the parent and Ms. Bizzarri was sufficient to make up for the lack of participation by any representative from L.R.'s then-current school. See Compl. Ex. B at 9. The parent is not an educator and did not observe L.R. in a classroom setting on a regular basis, and while Ms. Bizzarri was "knowledgeable about the special education services offered by the district," she was not familiar with L.R.'s specific deficits and needs, necessarily limiting her ability to recommend appropriate programming and services for L.R. See Compl. Ex. B at 9. In reaching her findings, the SRO alluded to Dr. Bowser's testimony that the Montessori School did not complete some of the paperwork requested by the CSE in time for the IEP meeting, but any such failure did not negate the CSE's responsibility to conduct a proper meeting. (Tr. 169, 186); see Compl. Ex. B at 9. To the contrary, if Dr. Bower was concerned that she was missing critical information, she should have ensured that a representative from L.R.'s then-current school participated in the meeting and also could have postponed the meeting to ensure that the requested material was provided. The Court should thus decline to defer to the SRO's erroneous and unsupported conclusion that the CSE's failure to conduct a properly constituted meeting did not result in a denial FAPE. See Compl. Ex. B at 9.

19

**B.** **A Preponderance of the Evidence Fails to Support the SRO's Finding that the IEP was Substantively Adequate.**

An IEP must "provid[e] personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction," and "afford[] the student with an opportunity greater than 'trivial advancement.'" Bd. of Educ. v. Rowley, 458 U.S. 176, 203 (1982).  It must "set out the child's present educational performance, establish[] annual and short term objectives for improvements in that performance, and describe the specially designed instruction and services that will enable that child to meet those objectives." M.H., 712 F. Supp. 2d at 130.  While an IEP must be evaluated as of the time of its drafting, a court "should also use evidence acquired subsequently to the creation of an IEP . . . to evaluate the reasonableness of the school district's decisions at the time they were made." R.E., 694 F.3d at 186.  Contrary to the SRO's findings, see Compl. Ex. B at 9-19, the record shows that the CSE's failure to fully evaluate L.R., to review sufficient evaluative material, and to conduct a validly constituted meeting, resulted in a substantively deficient IEP.

Contrary the SRO's findings, see Compl. Ex. B at 9-15, the CSE's failure to fully evaluate L.R. or to have a validly constituted IEP team resulted in an IEP that failed to fully and accurately reflect L.R.'s then-current levels of performance and needs.  The IEP does not give any academic functioning or instructional levels for L.R. Although Dr. Bowser testified that she *believed* that L.R. was functioning at a pre-K level because "[m]ost prekindergarten students are on a pre-K level, even if we give them the tests," she did not have any testing to substantiate this, and the cognitive score given in the IEP is based on a test that was given on August 6, 2008, almost two years prior to the review meeting. (Tr. 149; Ex. 8-5.)  The description of L.R.'s current social/emotional performance in the IEP consists of two lines taken from the Parent Survey, (Ex. 10,) completed by C.R., and a full

page summary that was simply photocopied from L.R.'s 2009 IEP. (Tr. 152; Ex. 4-5); see supra Part II.A.1.  The IEP also fails to reflect many of L.R.'s significant issues that were at least noted in materials supposedly considered by the CSE.  There is no indication in the IEP that L.R. has difficulty following directions, although this difficulty was noted in the Post-Observation Teacher Interview conducted by Dr. Bowser, (Ex. 12); and there is no mention of L.R.'s issues and difficulties with frustration tolerance, self-regulation, sensation, initiating and completing tasks independently, maintaining an appropriate level of arousal to participate in activities, screening out auditory and visual distractions in class, or of his need for 1:1 assistance and his averse response to music, all of which were noted in the OT Evaluation reviewed by the CSE. (Ex. 9.)  L.R.'s significant anxieties are not mentioned at all, and none of the behaviors that Dr. Bowser observed during her observation of L.R. which led her to believe that L.R. was autistic, including his spinning, perseverative behaviors, withdrawal, averse reaction to music, and not using language appropriately, are described or mentioned in the IEP. (Tr. 98.)  The SRO ignored these deficiencies and determined that the IEP was substantively appropriate, discounting the IHO's opposite conclusion that the IEP was substantively inadequate due to its failure to "address critical areas with regard to [L.R.'s] anxiety and social functioning." See Compl. Ex. B at 15-19; see Compl. Ex. A at 17.  The SRO did not explain her reasoning for diverging so significantly from the IHO's conclusion, and her finding on this issue does not merit deference.

The record similarly fails to support the SRO's finding that the IEP goals were appropriate and sufficient for L.R. See Compl. Ex. B at 15-17.  The goals included in an IEP must not only be aligned with a student's needs, but must also include sufficient information to enable measurement of the goals, including the evaluative criteria and procedures to be used in measuring progress. See

M.H., 712 F. Supp.2d at 155-56 (quoting N.Y.C.R.R. § 200.4(d)(2)).  The goals included in L.R.'s IEP fail to meet this standard.  L.R.'s SL goals and the goals that were included to address L.R.'s perceived need for cognitive and social skills development were photocopied in their entirety from the prior year's IEP without any modification or revision and without an independent evaluation or any updated reports or input from L.R.'s SL therapist or classroom teacher as to whether L.R. had met the goals or whether the goals continued to be appropriate for him. (Tr. 165-66, 169-70, 200; Ex. 9, 10.)  Instead, the CSE relied on L.R.'s mother, who is not an educator or therapist, to determine whether they were appropriate for L.R. for the 2010-11 SY. (Tr. 166, 169-70.)  The IHO properly found that the SL goals were inappropriate because they were included in the IEP without any consultation with a "professional," and that this error was particularly egregious in light of the CSE's classification of L.R.  as speech or language impaired. See Compl. Ex. A at 17.  The SRO erroneously found the goals to be appropriate without ever addressing the IHO's specific conclusions or why she disagreed with them. See Compl. Ex. B at 15-16.

In reaching her conclusion regarding the IEP goals, the SRO also erred in dismissing the fact that L.R. had already achieved the academic goals in the IEP by the start of the 2010-11 SY on the ground that the CSE was not aware that the goals would not be appropriate for L.R. by the start of the SY at the time of the IEP meeting itself. (Tr. 255-56); see Compl. Ex. B at 16.  The SRO improperly ignored the fact that a CSE must develop appropriate goals for the start of the following SY by engaging in an analysis of whether the student should continue to work on existing IEP goals during the ensuing SY or whether different or additional goals should be recommended.  Moreover, the SRO further discounted the absence of any input by anyone from L.R.'s then-current school in developing L.R.'s 2010-11 SY IEP, see supra Part II.A.2, which necessarily deprived the team of

input critical to determining whether to continue previous goals or to include new ones in L.R.'s 2010-11 IEP.

The SRO similarly erroneously discounted the IEP's failure to include any goals to address L.R.'s anxiety.  The SRO observed that L.R. "did not demonstrate anxiety at the time of the IEP meeting," but this conclusion is belied by the parent's testimony to the contrary and by the information contained in the OT Evaluation, which stated that L.R. would "cry when music was played," and become "distressed" during grooming activities. (Tr. 573; Ex. 9.)  The SRO's findings also ignored the fact that the information the CSE relied upon was outdated, incomplete and insufficient to fully appreciate L.R.'s educational needs. See supra Part II.A.1.  Had additional testing been conducted by the CSE, L.R.'s anxiety would have been more fully explored and could have been addressed in the IEP. (Tr. 453, 479.)  The SRO also ignored the IEP's failure to include goals addressing L.R.'s counseling or social skills issues. (Tr. 454, 457.)

The SRO further erred in reversing the IHO's finding that a 12:1:1 class would not be appropriate for L.R.  See Compl. Ex. B at 17-19; see Compl. Ex. A at 17.  The CSE based its decision to recommend a 12:1:1 class upon inadequate and outdated evaluative material and without consulting any of the individuals then involved in L.R.'s education. See supra Facts; see supra Part II.A & B.  The record also shows that Dr. Bowser's decision was made through a process of elimination rather than based on a belief that a 12:1:1 class was an appropriate program for L.R.  Dr. Bowser testified that L.R. was in a small class in his preschool program at the Montessori School, that he needed a smaller class setting and additional adult support during the school day, and that a general education program and integrated co-teaching program would have had too many students for L.R. (Tr. 125-26.)  She stated that "in a smaller class, the teacher and the para could have kept

an eye on him and gotten him into more of the activities, kept him on task more of the time, and

helped him." (Tr. 125.)  However, she also acknowledged that the behaviors she observed during her

classroom observation and L.R.'s lack of interaction with the other students in his preschool program

occurred in a class with only nine students and two teachers, and that there was nothing to indicate

that his behaviors would improve in a class with more students and fewer teachers. (Tr. 125, 172-74;

Ex. 11.)  Moreover, the CSE's decision to recommend a 12:1:1 program for L.R. serves as further

evidence of the CSE's failure to fully evaluate L.R.  See supra Facts; see supra Part II.A.1.  Despite

the fact that the CSE believed L.R. was autistic, Dr. Bowser illogically stated that she could not have

recommended a class with a smaller number of students because the only program on the continuum

with fewer than twelve students was "a 6:1:1 in District 75 for children with autism." (Tr. 172-74.)

According to C.R., the CSE review team said that since they really did not know whether L.R. was

on the spectrum given the absence of a diagnosis,"the 12 to one to one at that moment was the best

that they could offer." (Tr. 577-78.)  However, this only provides further evidence for how the CSE's

failure to fully evaluate L.R. resulted in a substantively inadequate IEP and thus is a deprivation of

FAPE to L.R.  The CSE was obligated to ensure that it fully understood L.R.'s needs and that it had

evaluated L.R. in all areas of suspected disability prior to developing his IEP so that it could develop

an IEP that would appropriately address L.R.'s needs.  Furthermore, as the IHO pointed out, even

after the CSE received Dr. Antar's evaluation diagnosis L.R. as autistic, the CSE did not respond for

several months and "essentially left [L.R.] with the 12:1:1 program that did not take account of the

information from a significant [then-current] evaluation." See Compl. Ex. A at 16.

　　　　The SRO erred in finding the 12:1:1 program appropriate simply because L.R.'s management

needs would "interfere with the instructional process to the extent that an additional adult is needed

within the classroom to assist" with his instruction. <u>See</u> Compl. Ex. B at 17.  In reaching this conclusion, the SRO improperly relied exclusively upon New York State Regulations defining a 12:1:1 class and the specific management needs listed in the IEP, as well as the testimony of Dr. Bowser, and completely ignored the contrary testimony from the individuals involved in L.R.'s education attesting to his need for more significant individual attention from a trained teacher than could have been provided in a 12:1:1 program. <u>Id.</u>   Dr. Antar, a licensed clinical child neuropsychologist who had been treating children on the autistic spectrum for about 25 years, evaluated L.R. shortly after the CSE meeting and testified that L.R. definitely presented as a child on the autism spectrum and met the criteria for autism spectrum disorder; that he needed 1:1 intervention with more than one person working with him; and that he should be placed in a small, structured and supportive self-contained learning environment with children of comparable intellectual abilities and in a class of six to eight children and two adults. (Tr. 485, 488-89, 493, 495, 520; Ex. I.3.) Dr. Antar further testified that placing L.R. in a class of up to twelve students with one teacher and one paraprofessional would not have provided him with a sufficient level of support in the classroom, and that he needed more intervention. (Tr. 498.)  The individuals involved in L.R.'s education also testified that a 12:1:1 class would not have been appropriate for L.R., as he required a high level of individual attention and support and the noise level generated by so many children would have created more anxiety issues for him. (Tr. 222-23,252-54, 273, 365, 368-69, 375, 382, 384, 498; Ex. I.)  Contrary to the SRO's erroneous suggestion, the fact that the IEP recommended management needs, related services, and annual goals, which "incorporated additional strategies" for L.R. to use in the classroom did not compensate for the inappropriateness of the 12:1:1 class recommendation for L.R. <u>See</u> Compl. Ex. B at 18-19.  The SRO also ignored the fact that L.R. was

25

attending a class of nine students and two teachers at the time of the IEP meeting and the CSE's lack of any evidence to suggest that L.R.'s needs could have been managed in a larger class with less teacher support. (Tr. 125, 172-74; Ex. 11.)

## III.   DEFENDANT FAILED TO SHOW THAT PS 151 WAS CAPABLE OF APPROPRIATELY IMPLEMENTING L.R.'S IEP.

### A.   The SRO Erroneously Construed the Scope of Defendant's Burden of Proof With Regard to the Appropriateness of the Offered Placement.

To show that it offered a student a FAPE, Defendant must demonstrate not only that it provided an appropriate placement, but also that the placement was capable of appropriately implementing the student's IEP. See D.C. v. New York City Dep't of Educ., 950 F. Supp. 2d 494, 509 (S.D.N.Y. 2013). The DOE is required to provide a student with a placement in a specific class at a specific school site that is reasonably calculated to provide meaningful educational benefit and to avoid regression, meaning, inter alia, that it includes similarly functioning peers. Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 123 (2d Cir. 1998); N.Y. Educ. L. § 4402(1)(b)(3)(b)(i); 8 N.Y.C.R.R. §§ 200.1(ww)(3)(i), 200.6(a)(3), (h).

The SRO improperly and erroneously concluded that Plaintiffs' challenges to the offered placement were speculative and irrelevant since Plaintiffs rejected PS 151 and never sent L.R. to the school. See Compl. Ex. B at 19-21.  The SRO misconstrued the law regarding Defendant's burden of proof with respect to the appropriateness of the offered placement in this case, specifically R.E. v. New York City Dep't of Educ., 694 F.3d 167 (2d Cir. 2012) and its progeny, and ignored the right of parents to participate meaningfully in the placement process and to consider the appropriateness of an offered placement before choosing whether to accept it. See Compl. Ex. B at 19-21.  The SRO's interpretation of the holding in R.E. v. New York City Dep't of Educ., 694 F.3d 167 (2d Cir.

2012) and its progeny as precluding parental challenges to an offered placement where the student never attended the school has since been conclusively rejected by the Second Circuit. See <u>M.O. v. New York City Dep't of Educ.</u>, No. 14-1473, 2015 U.S. App. LEXIS 12161, at *16-18, 22 (2d Cir. July 15, 2015) (rejecting the idea that "<u>R.E.</u> requires a child physically to attend a proposed placement school before [a parent can] challeng[e] that school's ability to implement the child's IEP" and clarifying that parental challenges to a placement's ability to implement a student's IEP services are not speculative, but viable where the defects in the placement were apparent to the parents at the time of their placement decision).  While "[s]peculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement," <u>see</u> <u>R.E.</u>, 694 F.3d at 195, that rule simply is meant to ensure that the appropriateness of an offered IEP and placement is assessed as of the time that the decision to unilaterally place is made and based upon the information available to the parties at the time, rather than based upon mere speculation that the public program might deviate from the IEP afterwards or based upon retrospective evidence offered to rehabilitate the IEP during a hearing. <u>See</u> <u>id.</u>; <u>D.C.</u>, 950 F. Supp. 2d at 510-11 ("[T]he Court evaluates whether, at the time [the parent] was actually considering the proposed placement, the school could offer [services] in line with the IEP.") (citation omitted).  Parents may "challenge a placement as inappropriate 'if the alleged defects were reasonably apparent . . . when the parent rejected the placement,' regardless of whether [the parent] ever actually enrolled [her child at the school]." <u>Scott v. New York City Dep't of Educ.</u>, 12 Civ. 3558, 2014 U.S. Dist. LEXIS 41238, at *53-54 (SDNY Mar. 25, 2014) (citation omitted). <u>see also</u> <u>M.O.</u>, 2015 U.S. App. LEXIS 12161, at *18-19.  As the Second Circuit observed in <u>M.O.</u>:

> [I]t is not speculative to conclude that an IEP recommending a

27

seafood-free environment, for a child with a life threatening seafood allergy, could not be implemented at a proposed school that was not seafood free.  Nor is it speculative to conclude that an IEP recommending one-on-one occupational therapy, outside of the classroom, could not be implemented at a school that provided only in-class occupational therapy in a group setting.

M.O. 2015 U.S. App. LEXIS 12161, at *18-19 (citing D.C., 950 F. Supp. 2d 494 at 513; B.R., 910 F. Supp. 2d at 676-79)).  Thus, it is clear that information gleaned as a result of conversations with school personnel or visits to a recommended school placement suggesting that the placement would be unable to appropriately implement a student's IEP program or appropriately address the student's needs is not speculative, and parents must be able to rely upon such information to make an informed decision about the placement offered. See F.B. v New York City Dep't of Educ., No. 14 Civ. 3902, 2015 WL 5564446, *11-13 (S.D.N.Y. Sep. 21, 2015).

        In reversing, the SRO not only erred in interpreting the relevant legal standard and concluding that Plaintiffs' placement challenges were impermissibly speculative in general because L.R. never attended PS 151, see supra, but also in determining that the parent's claims were speculative and foreclosed because it was "undisputed" that Plaintiffs rejected PS 151 before the school became obligated to implement L.R.'s IEP. See Compl. Ex. B at 20.  To the contrary, Plaintiffs did not reject the offered placement for L.R. until September 20, 2010, after the start of the 2010-11 SY when PS 151 became obligated to implement L.R.'s IEP.  Moreover, in reaching her conclusions, the SRO improperly suggested that there is a presumption that an offered placement will be able to implement a student's IEP for a given SY. See Compl. Ex. B at 20-21.  To the contrary, the application of any such presumption would improperly shift the burden of proof to the parents to *disprove* the appropriateness of an offered placement when the law clearly requires a school district to prove that

28

the placement it recommends to a child is reasonably calculated to provide meaningful benefit and to enable the child to make measurable progress. See N.Y. Educ. L. § 4404(1)(c).

For the foregoing reasons, Defendant had an obligation to show that the placement offered to L.R. for the 2010-11 SY was appropriate and capable of appropriately implementing his IEP as of the time C.R. actually considered the program for L.R.. The Court owes no deference to the SRO's erroneous contrary interpretation of the applicable legal standard. See Lillbask, 397 F.3d at 83.

**B.   PS 151 Was Inappropriate for L.R. and Would Have Been Unable To Implement His IEP.**

Defendant failed to meet its burden of proving that PS 151 would have been able to adequately implement L.R.'s IEP, and that L.R. would have been appropriately grouped for instructional purposes with the other students in the school. The IHO properly found that the placement offered to L.R. was inappropriate since the 12:1:1 class was too large, and concluded that it was irrelevant that the class only included four students on the first day of school, since the class could have gone up to twelve students. (Tr. 44, 45, 299, 584, 585.) Moreover, Megan Dubinsky, L.R.'s teacher during the 2010-11 SY, testified that a class of only four students would not have been appropriate for L.R. because it would have been too restrictive for L.R. and would not have provided him with the social skills and social interaction that was necessary for him to make progress. (Tr. 288.)

Additionally, the record shows that L.R. would not have been suitably grouped for instructional purposes with students having similar individual needs with regard to levels of academic or educational achievement and learning characteristics, levels of social development, levels of physical development, and management needs, had he been assigned to the recommended class, as Defendant claimed he would. Of the four students in the recommended class on the first day of school, one of

29

the students was globally delayed, was classified as intellectually disabled, was non-verbal, had toileting issues, had very minor interaction with the other students in the class, required a lot of support, and required his individual curriculum to be completely revamped so that there was one curriculum for him and another for the other three students in the class. (Tr. 300, 301, 304, 337, 346.) Ms. Whiting, the classroom teacher, testified that she did not believe this student was appropriate for the class, and both the principal of the school and Ms. Whiting identified this student as not appropriate on the first day of school; yet, the student remained in the class for seven months until March 2011. (Tr. 306, 345.) Of the remaining three students, all of whom needed support in learning to socialize and all of whom required one-on-one assistance during the 2010-11 SY, one was not toilet trained; one had a difficult time sustaining attention for long periods of time, sought movement, had a difficult time keeping his hands to himself, and needed to stim with a pencil; and one had all of the same issues as L.R., meaning that the student would not have been a positive role model for L.R. (Tr. 308, 325, 336, 342, 343.) This class was thus not reasonably calculated to provide L.R. with the level of individual support and assistance he required, and although Ms. Whiting testified that there were other children in the class with more appropriate social skills and regulation skills, the class as a whole would not have provided appropriate peer models for L.R., nor would the social interaction in the class have been beneficial to him or conducive to his social growth and maturity.

Defendant also failed to show that P.S. 151 would have appropriately addressed L.R.'s related service needs during the 2010-11 SY. L.R. required access to a fully-equipped sensory gym to address his significant sensory integration issues throughout the day and to enable him to function appropriately in class, but the recommended placement did not have one, and access to an off-site

facility one day a week would not have been sufficient for L.R.. (Tr. 225, 226, 326, 338, 339, 376, 392-394, 585.)

While Defendant provided testimony responding to some of C.R.'s allegations regarding P.S. 151 and its inappropriateness for L.R. during the impartial hearing, it would be inappropriate to permit Defendant to rely upon such retrospective testimony contradicting C.R.'s understanding of the offered placement in meeting its burden of proof since Defendant never responded to C.R.'s letters to correct her understanding of the offered program at any point prior to the underlying impartial hearing in this case. See D.C., 950 F. Supp. 2d at 513.  C.R. credibly testified about her visits to the school and reasonably relied upon her observations and the information provided to her in the absence of any information to the contrary from the DOE. (Tr. 584-86.)

The SRO's conclusions regarding PS 151 were neither well-reasoned nor careful and do not merit deference by this Court. R.E., 694 F.3d at 189.   Since the SRO erred in interpreting the relevant legal standard, see supra Part III.A, she necessarily erred in finding that the district "was not obligated to present retrospective evidence at the impartial hearing regarding the execution of the student's program or to refute the parent's claims" in order to sustain its Prong One burden. See Compl. Ex. B at 20-21.  The Southern District recently rejected a similar finding by the SRO in F.B. v New York City Dep't of Educ., No. 14 Civ. 3902, 2015 WL 5564446, *22-23 (SDNY Sep. 21, 2015).

Similarly, although the SRO claimed to consider, *arguendo*, whether the record supported a finding that PS 151 was not appropriate for L.R., and concluded that it did not support that finding, the SRO's assessment utterly fails to discuss any of the facts in the record or to provide any discussion at all in support of that conclusion. See Compl. Ex. B at 21.  Such a conclusory finding

does not merit deference by this Court.  <u>F.B.</u>, No. 14 Civ. 3902, 2015 WL 5564446 at *22-23; <u>see also</u> <u>B.R.</u>, 910 F. Supp. 2d at 677-78.  Furthermore, in failing to address any of Plaintiffs' specific claims regarding PS 151, but yet, still finding that "the evidence in the hearing record does not support the conclusion that . . . the district would have deviated from [L.R.'s] IEP in a material or substantial way," the SRO effectively presumed that Defendant's issuance of a placement offer meant that the placement listed was able to implement L.R.'s IEP and improperly shifted the burden of proof onto Plaintiffs to show that PS 151 could *not* have implemented L.R.'s IEP, in contravention of statutory requirements. <u>See</u> Compl. Ex. B at 21; N.Y. Educ. L. § 4404(1)(c).

**IV.   COOKE APPROPRIATELY ADDRESSED L.R.'S NEEDS FOR THE 2010-11 SY.**

The IHO properly concluded that Plaintiffs presented sufficient evidence to meet their burden of proof as to the appropriateness of Cooke for L.R. for the 2010-11 SY since the record amply shows that Cooke carefully crafted a program that was individually tailored to L.R.'s needs and that enabled him to make progress during the 2010-11 SY. <u>See</u> Compl. Ex. A at 17-18; (Tr. 246-48, 380-81, 442-43); <u>Gagliardo</u>, 489 F.3d at 102 (finding that parents only need to show that their chosen program provides "educational instruction specially designed to meet the unique needs of the . . . child, supported by such services as are necessary to permit the child to benefit from instruction"). The Court should thus reinstate the IHO's finding.

**V.   EQUITABLE CONSIDERATIONS SUPPORT PLAINTIFFS' CLAIM AND THEY QUALIFY FOR DIRECT FUNDING OF L.R.'S TUITION.**

To receive an award of tuition reimbursement, a weighing of the equities must support an award for tuition reimbursement, as "equitable considerations [relating to the reasonableness of the

action taken by the parents] are relevant in fashioning relief." Frank G., 459 F.3d, at 356 (citation omitted).  The record fully supports the IHO's conclusion that equitable considerations favor Plaintiffs in this case since it shows that the parents fully cooperated with the CSE, were willing to consider an appropriate public placement for their son for the 2010-11 SY, and gave timely and appropriate notice of their concerns and of their intent to unilaterally place L.R. at Cooke and to seek tuition funding. See Compl. Ex. A at 18; supra Facts.

Similarly, the record fully supports the IHO's finding that Plaintiffs qualify for direct funding for the cost of Cooke. See Compl. Ex. A at 14-16.  Given the documentary and testimonial evidence presented regarding Plaintiffs' financial situation, the IHO's conclusion that they could not afford to lay out the funds for L.R.'s tuition and his order directing the DOE to fund L.R.'s tuition were appropriate. See supra Facts; Mr. and Mrs. A., 796 F. Supp. 2d at 403.  The Court should thus reinstate the IHOs findings on these issues.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully requests that the Court find that Defendant failed to meet its burden of proving that it offered L.R. a FAPE for the 2010-11 SY; that Plaintiffs met their burden to show that their chosen unilateral placement, Cooke, was appropriate for L.R. for the 2010-11 SY; and that equitable considerations support their claim for direct funding for the cost of L.R.'s tuition.  Accordingly, Plaintiffs ask that the Court award them judgment as a matter of law, reverse the SRO's decision, reinstate the IHO's decision, direct Defendant to directly fund the cost of L.R.'s attendance at Cooke for the 2010-11 SY, and award them costs and attorney's fees, as well as any other such relief that the Court deems appropriate.

Dated:    New York, New York
          October 19, 2015

                        Respectfully Submitted,

                        _____s/_____
                        KIRA I. EPSTEIN (KE 2009)
                        Law Offices of Lauren A. Baum, P.C.
                        61 Broadway, Suite 1060
                        New York, New York 10006
                        Telephone: (212) 644-4414
                        Facsimilie: (212) 644-8470
                        *Counsel for Plaintiff*

TO:  Stephen Pipenger (Via ECF)
     Lesley Berson Mbaye (Via Email)
     New York City Law Department
     *Counsel for Defendant*