UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 9/30/2016

---

C.R. and A.R, individually and on behalf of L.R.,

Plaintiffs,

- against -

THE NEW YORK CITY DEPARTMENT OF
EDUCATION,

Defendant.

**OPINION AND ORDER**

15 Civ. 3051 (ER)

Ramos, D.J.:

C.R. and A.R., individually and on behalf of their child, L.R. (collectively, "Plaintiffs"),

filed suit against the New York City Department of Education ("DOE") under the Individuals

with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, Section 504 of the

Rehabilitation Act of 1973, 29 U.S.C. §§ 794 *et seq.*, and Article 89 of the New York State

Education Law, N.Y. Educ. Law §§ 4401 *et seq.*, seeking funding for L.R.'s tuition at the Cooke

Center for Learning and Development ("Cooke") during the 2010–2011 school year.  Before the

Court are the parties' cross-motions for summary judgment.  Docs. 10 & 14.[1]  For the reasons set

forth below, Plaintiffs' motion for summary judgment is DENIED and the DOE's motion for

summary judgment is GRANTED.

## I.  STATUTORY FRAMEWORK

### A.  The IDEA

Congress enacted the IDEA to encourage the education of children with disabilities.

*E.A.M. ex rel. E.M. v. N.Y.C. Dep't of Educ.*, 11 Civ. 3730 (LAP), 2012 WL 4571794, at *1

---

[1] "Doc." references are to ECF docket numbers in Case No. 15-cv-3051.

(S.D.N.Y. Sept. 29, 2012) (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 179 (1982)).  The statute

mandates that any state receiving federal funds must provide a free appropriate public education

("FAPE") to children with disabilities.  20 U.S.C. § 1412(a)(1)(A); *Rowley*, 458 U.S. at 179.

The FAPE provided by the state must include "special education and related services" tailored to

meet the unique needs of the particular child, 20 U.S.C. § 1401(9), and must be "reasonably

calculated to enable the child to receive educational benefits," *Rowley*, 458 U.S. at 207.

A public school ensures that a student with disabilities receives a FAPE by providing the

student with an Individualized Education Plan ("IEP").  *See Polera v. Bd. of Educ.*, 288 F.3d

478, 482 (2d Cir. 2002).  An IEP is a written statement, collaboratively developed by the parents

of the child, educators, and specialists, that "sets out the child's present educational performance,

establishes annual and short-term objectives for improvements in that performance, and

describes the specially designed instruction and services that will enable the child to meet those

objectives."  *M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 239 (2d Cir. 2015) (quoting *R.E. v.

N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012)).

Because New York State receives federal funds under the IDEA, it must comply with the

requirements of the statute.  *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 123 (2d Cir.

1998).  In New York, the task of developing an IEP rests with local Committees on Special

Education ("CSEs"), whose members are appointed by the board of education or trustees of the

school district.  *Id.* (citing N.Y. Educ. Law § 4402(1)(b)(1); *Heldman ex rel. T.H. v. Sobol*, 962

F.2d 148, 152 (2d Cir. 1992)).  "CSEs are comprised of members appointed by the local school

district's board of education, and must include the student's parent(s), a regular or special

education teacher, a school board representative, a parent representative, and others."  *R.E.*, 694

F.3d at 175 (citing N.Y. Educ. Law § 4402(1)(b)(1)(a)).  "In developing a child's IEP, the CSE is

required to consider four factors: '(1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs.'" *E.A.M.*, 2012 WL 4571794, at *1 (quoting *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107–08 (2d Cir. 2007)).

To provide a FAPE, an IEP must be "reasonably calculated to enable the child to receive educational benefits," "likely to produce progress, not regression," and afford the student with an opportunity to achieve greater than mere "trivial advancement." *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192, 195 (2d Cir. 2005) (quoting *Walczak*, 142 F.3d at 129–30). "A school district is not, however, required to furnish 'every special service necessary to maximize each handicapped child's potential,'" *id.* at 195 (quoting *Rowley*, 458 U.S. at 207), or "everything that might be thought desirable by loving parents," *Walczak*, 142 F.3d at 132. Rather, the IDEA calls only for selection of a program that provides a "basic floor of opportunity." *Walczak*, 142 F.3d at 132; *see id.* at 130 ("IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP."). "[B]ecause public 'resources are not infinite,' federal law 'does not secure the best education money can buy; it calls upon government, more modestly, to provide an appropriate education for each [disabled] child.'" *Id.* (quoting *Lunceford v. D.C. Bd. of Educ.*, 745 F.2d 1577, 1583 (D.C. Cir. 1984)); *see also C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 72 (2d Cir. 2014). Furthermore, under an IEP, "education [must] be provided in the least restrictive setting consistent with a child's needs" and the CSE must "be mindful of the IDEA's strong preference for mainstreaming, or educating children with disabilities [t]o the maximum extent appropriate alongside their non-disabled peers." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 224 (2d Cir. 2012) (internal quotation marks omitted).

In addition to imposing the IEP requirement, the IDEA provides for due process procedures to promptly resolve disputes that arise between parents and school districts, so that children will receive appropriate special education services. 20 U.S.C. § 1415(b)(6)–(b)(7). New York State has implemented a two-tiered system of administrative review for disputes regarding "any matter relating to the identification, evaluation or educational placement of a student with a disability . . . or the provision of a [FAPE] to such a student." *Id.*; 8 N.Y.C.R.R. § 200.5(i)(1). First, "[p]arents may challenge the adequacy of their child's IEP in an 'impartial due process hearing' before an IHO appointed by the local board of education." *E.A.M.*, 2012 WL 4571794, at *2 (quoting *Gagliardo*, 489 F.3d at 109). Either party may then appeal the IHO's decision to the New York State Review Officer ("SRO"), an officer of New York State's Board of Education tasked with conducting an impartial review of the proceedings. *Id.*; 34 C.F.R. § 300.514(b)(2); 8 N.Y.C.R.R. § 279.1(d).

After the SRO has rendered its decision, either party may then appeal to either state or federal district court. N.Y. Educ. Law § 4404(3)(a). If appealed to federal district court, the court must "receive the records of the administrative proceedings" and, if requested by the parties, hear additional evidence. 20 U.S.C. § 1415(i)(2)(C). The district court then "grant[s] such relief as the court determines is appropriate," based on the preponderance of the evidence. *Id.* Under the statute, "appropriate" relief may include reimbursement for the cost of a private school placement. *E.A.M.*, 2012 WL 4571794, at *2.

### B.  Claims for Tuition Reimbursement Under the IDEA

"'Parents who . . . believe that a FAPE is not being provided to their child may unilaterally enroll the child in a private school and seek tuition reimbursement from the school district' by filing what is known as a 'due process complaint.'" *M.O.*, 793 F.3d at 239 (quoting

*Hardison v. Bd. of Educ.*, 773 F.3d 372, 376 (2d Cir. 2014); and citing N.Y. Educ. Law
§ 4404(1); and 20 U.S.C. § 1412(a)(10)(C)(ii)).  Parents who unilaterally place their child in a
private school do so "at their financial risk." *Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ.*, 760
F.3d 211, 215 (2d Cir. 2014).

"The Supreme Court has established the three-pronged *Burlington/Carter* Test to
determine eligibility for [tuition] reimbursement, which looks to (1) whether the school district's
proposed plan will provide the child with a free appropriate public education; (2) whether the
parents' private placement is appropriate to the child's needs; and (3) a consideration of the
equities." *C.F.*, 746 F.3d at 73 (citation and internal quotation marks omitted).[2]

With specific respect to the first *Burlington/Carter* prong, "challenges to a school
district's proposed placement school must be evaluated prospectively (i.e., at 'the time of the
parents' placement decision') and cannot be based on mere speculation." *M.O.*, 793 F.3d at 244
(quoting *R.E.*, 694 F.3d at 195).  Thus, evaluation of the IEP must be based only on information
available to the parent at the time he or she was considering the IEP and the school district's
proposed placement, and not on retrospective evidence that came to light after the parent chose
to reject the district's placement and enroll the child in private school.  *See, e.g.*, *id.*; *R.E.*, 694
F.3d at 188.

"Under New York's Education Law § 4404(1)(c), the local school board bears the initial
burden of establishing the validity of its plan at a due process hearing.  If the board fails to carry
this burden, the parents bear the burden of establishing the appropriateness of their private

---

[2] The *Burlington/Carter* test is named after two Supreme Court cases:  *School Committee of the Town of Burlington v. Department of Education of the Commonwealth of Massachusetts*, 471 U.S. 359, 370, 374 (1985), and *Florence County School District Four v. Carter*, 510 U.S. 7, 15–16 (1993).

placement and that the equities favor them." *R.E.*, 694 F.3d at 184–85 (citing *Cerra*, 427 F.3d at 192).[3]  The district court retains discretion over whether to award tuition reimbursement.  *See* 20 U.S.C. § 1412(a)(10)(C)(ii) ("[A] court or a hearing officer *may* require the agency to reimburse the parents for the cost of [private] enrollment.") (emphasis added).

### C.  Section 504 Claims

Section 504 of the Rehabilitation Act of 1973 provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  The "IDEA and Section 504 are complementary, but they address different injuries and thus require different proof.  Specifically, Section 504 offers relief from discrimination, whereas IDEA offers relief from inappropriate educational placement, regardless of discrimination." *Gabel ex rel. L.G. v. Bd. of Educ.*, 368 F. Supp. 2d 313, 333 (S.D.N.Y. 2005).

 "A plaintiff may assert a Section 504 claim in conjunction with an IDEA claim on the theory that he has been denied access to a free appropriate education, as compared to the free appropriate education non-disabled students receive." *D.C. ex rel. E.B. v. N.Y.C. Dep't of Educ.*, 950 F. Supp. 2d 494, 517–18 (S.D.N.Y. 2013) (citation and internal quotation marks omitted).  "To recover under the Rehabilitation Act, there must be evidence that:  (1) the student is disabled; (2) the student is otherwise qualified to participate in school activities; (3) the school or the board receives federal financial assistance; and (4) the student was excluded from participation in programs at, denied the benefits of, or subject to discrimination at, the school on

---

[3] "[T]o the extent that a court 'must determine whether the state administrative decisions were supported by a preponderance of the evidence, which party bore the burden of persuasion in the state review scheme is only relevant if the evidence was in equipoise.'" *Reyes*, 760 F.3d at 215 (quoting *M.H.*, 685 F.3d at 225 n.3).

the basis of her disability."  *Id.* at 518 (quoting *Schreiber v. E. Ramapo Cent. Sch. Dist.*, 700 F.

Supp. 2d 529, 564 (S.D.N.Y. 2010)).

"Since Section 504 relief is conditioned on a showing of discrimination, it requires

something more than proof of a mere violation of IDEA—*i.e.*, more than a faulty IEP."  *Gabel*,

368 F. Supp. 2d at 334 (citing *J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 70 (2d Cir. 2000)).  Rather,

a plaintiff must prove some additional level of "intentional discrimination," which "may be

inferred when a school district acts with gross negligence or reckless indifference in depriving a

child of access to a FAPE."  *Id.*

## II.  REVIEW OF ADMINISTRATIVE RECORD

### A.  Background Facts

L.R. was born in 2005, which means he turned 5 years old during the 2010–2011 school

year.  Ex. 13-1.[4]  L.R. sat independently at the age of 6 months, began walking at the age of 12

months, and began speaking at the age of 2 years.  Ex. I-1; Ex. 9-2.  When his language "seemed

to stop developing," L.R. was referred to the Early Intervention Program and began receiving

speech and language and occupational therapies at home.  Ex. I-1; Tr. 571–72; Tr. 601.

For the 2009–2010 school year, L.R. attended preschool at the Montessori School in

lower Manhattan, in a general education class of nine students with two teachers.  Ex. 2-1; Ex.

11-1; Ex. 15; Ex. I-1; Tr. 96; Tr. 173; Tr. 601.  While in preschool, L.R. continued to receive

both speech and language and occupational therapies, pursuant to an IEP dated August 4, 2009.

Ex. I-1; Ex. 9-1 to 9-2; Ex. 11-3; Ex. 12-2; Tr. 572–73.

---

[4] Citations to "Ex." refer to the parties' exhibits from the underlying impartial hearing in this case, citations to "Tr." refer to pages of the transcript of the underlying impartial hearing in this case, and citations to "IHO Ex." refer to exhibits entered into the record by the IHO in the underlying impartial hearing in this case.

### B.  CSE Meeting

On April 29, 2010, the DOE convened a CSE meeting to develop an IEP for L.R. for the 2010–2011 school year.  Tr. 95; Ex. 4.  The CSE was comprised of L.R.'s mother (Plaintiff C.R.), a friend of C.R.'s, a school psychologist (Dr. Diane Bowser), a special education teacher (Mary Ellen Bizzarri), and a general education teacher who also served as the DOE representative (Tara Napoleoni).  Tr. 576; Ex. 2-3; Ex. 4-2.  No one from the Montessori School participated in the meeting.  Tr. 145, Tr. 576; Ex. 2-3; Ex. 4-2.

At the meeting, the CSE reviewed and considered:  (1) L.R.'s IEP for the previous year; (2) an August 4, 2009 Child Outcomes Summary Form completed by a Committee on Preschool Special Education ("CPSE") administrator (Ex. 8); (3) a January 13, 2010 parent survey completed by C.R. (Ex. 10); (4) a March 16, 2010 occupational therapy school function evaluation completed by Mary Holahan (Ex. 9); (5) notes from an April 21, 2010 classroom observation conducted by Dr. Bowser at the Montessori School, including notes of a post-observation conference with L.R.'s teacher (Ex. 11; Ex. 12); and (6) an April 27, 2010 physical examination report from L.R.'s physician (Ex. 13).  Tr. 104–110; Tr. 118; Ex. 7.

*Child Outcomes Summary Form.*  The August 4, 2009 Child Outcomes Summary Form summarizes the results of tests administered to L.R. in July and August 2008, including the Vineland Adaptive Behavior Scales; the Stanford-Binet Intelligence Scales; the Preschool Language Scale, Fourth Edition; the Peabody Developmental Motor Scales, Second Edition; and Brigance.  Ex. 8.  The form also provides the CPSE's assessment of L.R.'s social-emotional skills, ability to acquire and use knowledge, and use of appropriate behaviors to meet his needs.  Ex. 8; Tr. 107–108.  Although the CSE was required to complete an exit summary on the Child Outcomes Summary Form, to compare L.R.'s progress throughout the year, much of that portion

of the form was left blank.  Tr. 108; Ex. 8.  The CSE did, however, indicate that L.R. had made

some progress since the prior year.  Tr. 108; Ex. 8-13.

*Parent Survey.*  According to C.R.'s January 13, 2010 parent survey, the services L.R.

had been receiving improved his language abilities and helped him with his sensitivities,

concentration, and attention span.  Ex. 10.  C.R. wrote that L.R. loved to learn but got distracted

easily, that he loved to play with his younger brother in a physical way ("run after him, play hide

and seek"), that he loved people and wanted to get their attention so they could play with him,

that he participated in gymnastics, and that he enjoyed listening to classical music, playing

outside in playgrounds, dancing, spelling, words, and numbers.  Ex. 10.

*Occupational Therapy Evaluation.*  Ms. Holahan's March 16, 2010 occupational therapy

school function evaluation consisted of a classroom observation, parent interview, and teacher

interview.  Ex. 9-2.  Both L.R.'s mother and teacher reported that L.R. was having difficulties

with behavior and attention (distractibility, on task behavior, frustration tolerance, sensory

regulation).  Ex. 9-2 to 9-3.  Ms. Holahan concluded that L.R.'s difficulties with behavior and

attention affected his independent participation in the classroom, noting, among other things, that

L.R.:  required 1:1 assistance to choose activities for work in the classroom; required verbal cues

to participate in the work activities selected; did not demonstrate the ability to initiate and

complete tasks independently; required more assistance to participate in tabletop tasks as

compared to his peers; demonstrated difficulty maintaining an appropriate level of arousal to

participate in activities optimally; demonstrated difficulty screening out auditory and visual

distraction in the classroom; constantly mouthed his shirt or hands; moved around the school

with poor attention to personal boundaries; and demonstrated an averse response to music.  Ex.

9-3.  Ms. Holahan also noted, however, that L.R.:  appeared content in his classroom;

demonstrated an awareness of the classroom routines and an ability to transition with peers in line to the playroom for play time; and benefitted from verbal cues and/or physical prompts in order to follow directions in the classroom.  Ex. 9-3.

L.R.'s mother and teacher also reported that L.R. was having difficulties with social and emotional development.  Ex. 9-2 and 9-4.  Ms. Holahan concluded that L.R.'s social and emotional difficulties affected his performance in the school setting, noting, among other things, that L.R.:  played alone and did not interact with peers in his class; moved throughout the playroom without attention to his peers; and made inconsistent eye contact.  Ex. 9-4.  Ms. Holahan also noted that although L.R. accepted adult assistance when offered, he did not seek out adult assistance in the classroom, and he did not express his needs or wants consistently for his teachers.  Ex. 9-4.

Although L.R.'s teachers reported that L.R. required assistance with his clothes fasteners (snaps and buttons), and Ms. Holahan observed that L.R. benefitted from verbal cues when toileting at school, Ms. Holahan concluded that L.R.'s difficulties with self-care skills were managed in the classroom setting.  Ex. 9-4.  With respect to L.R.'s fine motor skills, L.R.'s teachers reported that L.R. used two hands to complete activities, and Ms. Holahan observed that L.R. did not appear to have established hand dominance.  Ex. 9-4.  Neither L.R.'s mother nor his teachers reported concerns regarding L.R.'s gross motor skills, and Ms. Holahan noted that L.R. demonstrated strengths in this area.  Ex. 9-5.

Ms. Holahan ultimately recommended that L.R. receive occupational therapy services twice a week, for thirty minutes per session, in groups of up to two students.  Ex. 9-5.  Ms. Holahan explained that occupational therapy would address L.R.'s issues with self-regulation, attention in the classroom, fine motor skills, and social participation.  Ex. 9-5.

10

***Classroom Observation.***  Dr. Bowser's April 21, 2010 observation at the Montessori School lasted for fifty minutes.  Ex. 11-1; Tr. 97.  When she arrived, two teachers and nine students, including L.R, were in the playroom.  Ex. 11-1.  Dr. Bowser observed L.R. running around the playroom and bumping into other students, jumping into the air and spinning as he did so, and putting his fingers into his mouth.  Ex. 11-1; Tr. 98–100.  While in the hallway, L.R. required assistance putting on his shoes and required a redirection to return to the line when the class was transitioning from the playroom to the classroom.  Ex. 11-2; Tr. 99.  In the classroom, Dr. Bowser observed L.R. putting the ends of his shirt into his mouth, and observed that L.R. required multiple redirections.  Ex. 11-2.

After the observation, Dr. Bowser spoke to L.R.'s teacher, Khadija Luzrak.  Ex. 11-2 to 11-3.  Ms. Luzrak told Dr. Bowser that L.R.'s behavior during the observation was typical of his day-to-day functioning.  Ex. 11-3; Ex. 12-1; Tr. 99.  Dr. Bowser claims she gave Ms. Luzrak a teacher's report to fill out, but that she never received back a completed copy from either the teacher or the director at the Montessori School.  Ex. 12-2; Tr. 101–102; Tr. 207.

***Physical Examination.***  L.R.'s physician, Dr. Priscilla Ware, completed a physical examination for the CSE on April 27, 2010.  Ex. 13.  Dr. Ware diagnosed L.R. with a developmental delay, and noted that L.R. "had (or now has)" both a speech problem and autism.  Ex. 13-1 to 13-2.  The report did not include any details regarding these impressions.  Ex. 13.

***CARS.***  At the CSE meeting, Dr. Bowser expressed concerns that L.R. had some autistic features.  Tr. 105; Tr. 110; Tr. 577.  Dr. Bowser thus asked C.R. to fill out a Childhood Autism Rating Scale ("CARS"), which goes through a series of questions regarding a child's behaviors and provides a total score indicating whether the child is autistic and to what degree.  Tr. 105–106; Tr. 110–111; Ex. 14.  Dr. Bowser concluded, however, that the results of the test were not

11

reliable, since she felt, based on her classroom observation and discussion with L.R's teacher, that C.R. was overestimating L.R.'s abilities.  Tr. 112; Tr. 114; Tr. 185–187; Ex. 2-3 to 2-4.

Despite her concerns, Dr. Bowser did not conduct or request any additional evaluations to determine whether L.R. was indeed autistic prior to developing his IEP.  Tr. 126–127; Tr. 148–149.[5]  The CSE did recommend that C.R. explore more about autism to determine if this was a more appropriate classification for her son.  Ex. 2-4.

## C. IEP

The April 29, 2010 IEP classifies L.R. as a student with a speech or language impairment and provides an overview of L.R.'s levels of performance and individual needs, with reference to the documentation reviewed by the CSE.  Ex. 4.  With regard to L.R.'s social/emotional performance, the IEP notes that L.R. "requires additional adult support in the classroom setting to remain on task, complete assignments, and improve his attention span," that "his teachers and his related service providers will be responsible for additional behavioral support if necessary," and that L.R. would "receive counseling services in the school setting."  Ex. 4-4.[6]  The CSE also included a photocopy of L.R.'s social/emotional performance from his August 4, 2009 IEP.  Ex. 4-5; Tr. 152–153.  This page from the prior IEP contains comments from C.R. regarding her son

---

[5] According to Dr. Bowser, the next level of testing to determine whether L.R. was autistic would have been the Autism Diagnostic Observation Scale ("ADOS").  Tr. 114; Tr. 126; Tr. 188.  Dr. Bowser could not administer that test, because she was not qualified; on or around May 6, 2010, however, she referred C.R. to the NEST program (a program for higher functioning children with autism), which could.  Tr. 113–114; Tr. 130; Tr. 178; Ex. 15; Ex. 16.  The head of the NEST program, Dr. Nilofer Naqvi, observed and evaluated L.R., and although she concluded that he was on the autism spectrum, she determined that the NEST program was not appropriate for him at that time.  Ex. 16; Tr. 579; Tr. 595.  Instead, she recommended an intensive year of preschool to see if he would progress enough for the NEST program the following year.  Tr. 579; Ex. E.  C.R. did not want to keep L.R. in preschool for a second year, with no guarantee of getting into the NEST program, so she declined Ms. Naqvi's offer.  Tr. 580; Tr. 600; Ex. E.

[6] Although the CSE checked off a box on the IEP that says that L.R.'s "[b]ehavior seriously interferes with instruction and requires additional adult support," Ex. 4-4, Dr. Bowser testified that L.R. did not have behaviors that seriously interfered, and that they only checked off that box because L.R. needed an extra person in the classroom (i.e., 12:1:1 as opposed to just 12:1).  Tr. 151–152, Tr. 154–156, Tr. 196–197.

and notes that L.R. scored in the clinical range on the Pervasive Developmental Problems scale

of the Child Behavior Checklist ("CBCL").  Ex. 4-5.  The prior IEP also notes that L.R. scored at

the moderately low level for socialization on the Vineland Adaptive Behavior Scales, and

summarized his weaknesses in interpersonal relations and play and leisure skills, including that

he did not yet:  answer when a familiar adult made small talk, repeat phrases heard previously

from an adult, imitate complex actions several hours after watching someone else perform them,

or use words to express emotions.  Ex. 4-5.  Dr. Bowser testified that she believed this

information from the prior IEP was still current, based on her own observations.  Tr. 153.

        With regard to L.R.'s health status and physical development, the IEP states that L.R. is

in good health.  Ex. 4-6.  The CSE also included a photocopied page from L.R.'s prior IEP,

which noted that L.R. was an "active child" with "no gross motor concerns" who had "[s]ensory

issues," including "craving movement, mouthing objects and being fussy about eating mixed

textures."  Ex. 4-7.  To address his health/physical management needs, the IEP states that L.R.

requires "[m]ovement breaks throughout the day" and "preferential sitting as needed for

attention."  Ex. 4-6.

        With regard to L.R.'s academic performance and needs, the IEP states that L.R. "has

difficulty focusing on tasks," "should have questions, directions, and instructions repeated for

him," and "should receive preferential seating in order to receive more support and assistance

from the teacher during the school day."  Ex. 4-3.

        In addition to detailing L.R.'s performance levels and needs, the IEP includes annual

goals, which describe what L.R. would be expected to achieve by the end of the 2010–2011

school year.  Ex. 4-9 to 4-13.  The IEP specifies ten annual goals in different areas, which are

broken down into a total of eighteen short-term objectives.  *Id.*  Four of the annual goals are new

occupational therapy goals provided by Ms. Holahan (writing and drawing, managing clothing fasteners independently, remaining on tabletop tasks or lessons on the rug for extended periods of time, and participating during group play/work as an active member of a group while maintaining personal boundaries).  Tr. 120–121; Ex. 4-11 to 4-12.

The remaining goals were copied over from L.R.'s prior IEP.  Ex. 4-9 to 4-10, 4-13; Tr. 118–120.  These include speech and language goals (vocabulary, sentence structure, auditory processing, and responding to questions), an academic goal (increasing cognitive skills), and a social skills goal.  Ex. 4-9 to 4-10, 4-13; Tr. 129.  According to Dr. Bowser, the CSE discussed with C.R. whether or not L.R.'s prior goals had been achieved, and if a goal had not been achieved, the CSE included it and noted that L.R. needed more time to achieve it.  Tr. 118–120; Tr. 128–130; Tr. 168–170.

In order for the foregoing needs and goals to be met, the IEP recommended that L.R. be placed in a ten-month, 12:1:1 class (one teacher, one paraprofessional, and no more than twelve students) in a special class environment.  Ex. 4-1, 4-14.  In addition, the IEP provided that L.R. should continue to receive speech-language therapy (two thirty-minute sessions per week, one individually and one in a group of up to three students) and occupational therapy (two thirty-minute sessions per week in a group of up to two students), and should begin to receive individual counseling services (one thirty-minute session per week).  Ex. 4-1, 4-16.  In making these recommendations, the IEP explained that L.R. "requires a small student-to-teacher ratio to receive support and assistance throughout the school day," that "he should continue receiving the related services of speech/language therapy and occupational therapy," and that he should begin "counseling services to address [his] socialization issues."  Ex. 4-14.

14

The IEP noted that the CSE considered and rejected a General Education Only program, a Special Education Teacher Support Services program, and a Collaborative Team Teaching program for L.R.  Ex. 4-15.  The IEP explained that these programs were not appropriate for L.R. because he was "experiencing difficulties in the areas of speech/language development, fine motor coordination skills, sensory issues, and socialization" and needed "a small class placement with a special education teacher on a full-time basis" and a "small student-to-teacher ratio."  Ex. 4-15.

### D.  Placement Offer

On or around June 15, 2010, Plaintiffs received a Final Notice of Recommendation ("FNR") offering L.R. a placement in a 12:1:1 special class at P.S. 151 for the 2010–2011 school year.  Ex. 6.  C.R. subsequently visited the school, but because the class was under construction, she was not able to view it.  Tr. 580–581; Ex. C; Ex. F.  On or around June 30, 2010, C.R. sent a letter to the CSE requesting information about the class, including the classifications and disabilities of the other children in the class, the adult-to-student ratio, the instructional methodologies that would be used, and whether there was a speech and language therapist, occupational therapist, and counselor on staff.  Ex. C; Tr. 581.  C.R. did not receive a response to her letter.  Tr. 581; Ex. F.

On or around August 8, 2010, C.R. sent a second letter to the CSE, notifying them that she would visit the school in early September to assess whether it was appropriate.  Ex. F.  C.R. also expressed a concern that L.R. would not have a sufficient level of support in a 12:1:1 program.  Ex. F.  C.R. enclosed a copy of a June 7, 2010 psychological evaluation conducted by Dr. Georgi Antar, who recommended, among other things, a smaller class size of six to eight

students.  Tr. 583; Ex. F; Ex. I-3.  C.R. asked the CSE to consider Dr. Antar's findings and

recommendations.  Tr. 583; Ex. F.  C.R. again received no response to her letter.  Tr. 583.

On September 14, 2010, C.R. visited P.S. 151, and the guidance counselor gave her a

tour.  Tr. 584; Ex. G-1.  C.R. thereafter sent a letter to CSE, notifying them that she found the

class inappropriate for L.R.  Tr. 586; Ex. G.  Among other things, C.R. noted that the class had

only enrolled four children, which would be too restrictive for L.R.  Ex. G-1; Tr. 584.  C.R. also

noted, however, that if the class enrolled twelve students, as anticipated, L.R. would not get

enough individual attention from a special education teacher.  Ex. G-1.  C.R. stated that she

remained willing to consider any appropriate placement offered to her son, but that, in the

interim, she would send him to Cooke for the 2010–2011 school year and seek tuition

reimbursement for that placement.  Ex. G-2.  C.R. again asked that the CSE schedule a meeting

to consider Dr. Antar's findings and recommendations, which she sent a second time.  Ex. G-2.[7]

In June 2010, Plaintiffs entered into an enrollment contract with Cooke for the 2010–

2011 school year.  Ex. M; Tr. 588–589.[8]  The contract states that in the event Plaintiffs are

denied all or part of their request for direct tuition funding from the DOE, Plaintiffs are obligated

to pay the tuition due.  Ex. M-2.  The total tuition obligation incurred by Plaintiffs for the 2010–

2011 school year is $44,500 and that amount is still due and owing.  Ex. K; Tr. 589.

### E.  Due Process Complaint and Impartial Hearing

On August 8, 2011, Plaintiffs filed a Due Process Complaint seeking funding for L.R.'s

tuition for the 2010–2011 school year.  Ex. A.  Plaintiffs alleged that the DOE failed to offer

---

[7] The CSE did reconvene in November 2010, after the start of the 2010–2011 school year, at which time it
reclassified L.R. as a student with autism and recommended a 6:1:1 special class in a specialized school.  Tr. 586;
Ex. 1; IHO Ex. I, II.  The adequacy of the November 2010 IEP is not currently before this Court.

[8] The contract would have allowed Plaintiffs to withdraw L.R. from Cooke without financial penalty if, by October
2010, the DOE offered L.R. an appropriate public placement for the 2010–2011 school year.  Ex. M-2; Tr. 589.

L.R. a FAPE for the 2010–2011 school year on both procedural and substantive grounds.  *See id.*
Among other things, Plaintiffs asserted that:  (1) the CSE was improperly constituted; (2) the IEP
was not based upon sufficient evaluative material; (3) the IEP failed to fully and accurately
describe L.R.'s then-current levels of performance and needs; (4) the IEP goals were vague,
generic, and insufficiently comprehensive to address L.R.'s needs; (5) the 12:1:1 recommended
placement failed to provide the level of individual attention and support that L.R. requires; and
(6) the assigned placement at P.S. 151 was inappropriate.  *See id.*

      An impartial hearing was convened and took place over nine days, concluding on August
3, 2012.  The IHO heard testimony from seven witnesses:  C.R., Dr. Bowser, Dr. Antar, Lindsey
Whiting (the teacher who would have taught L.R. at P.S. 151), Megan Dubinsky (L.R.'s teacher
at Cooke for the 2010–2011 school year), Nancy Wright (L.R.'s psychologist at Cooke), and
Cindy Surdi (a head teacher at Cooke).

      In his decision, the IHO relied primarily upon the testimony of Dr. Bowser, who testified
regarding the CSE meeting and development of the IEP.  Tr. 100–211.  Dr. Bowser testified that
she began thinking L.R. had autism after observing him, based on his spinning, perseverative
behaviors, withdrawal, improper use of language, and bumping into things.  Tr. 98–100.  When
asked why she did not conduct any further testing to confirm whether L.R. had autism prior to
completing the IEP, Dr. Bowser stated that the CSE "had enough documentation to support
speech or language impairment and a 12:1:1."  Tr. 126–127.  Dr. Bowser further testified:  "We
don't go by your classification so much.  We go by your need, and his need was for a smaller
class.  So the 12 students was appropriate.  The one teacher was appropriate.  The one para was
appropriate.  That was addressing his need, and that's what we were looking at."  Tr. 127–128.
Dr. Bowser also stated that the CSE had to make sure L.R. had an appropriate program for

September, and that sending L.R. for further testing would not have guaranteed him placement in a program for autistic children.  Tr. 127.  Dr. Bowser testified that if L.R. qualified for such a program, he should be given an opportunity to look at that class, but he should also have the 12:1:1 placement as an option if he did not qualify.  Tr. 178.  Dr. Bowser also testified that the CSE team "leaves in June," and if she asked L.R.'s mother to have him tested for autism before completing the IEP, the IEP "might be done by somebody else during the summer."  Tr. 192.  When asked to explain, Dr. Bowser stated:  "My team, my child on the list, my responsibility."  Tr. 192.

Dr. Bowser testified that the CSE chose a speech and language classification for L.R. because it was "obvious" in the reports that L.R. "had expressive, receptive, and pragmatic language problems," and she herself observed that L.R. was not using language appropriately.  Tr. 113.  Dr. Bowser further testified that "it's a part of autism, that you have problems with social development, and you have problems with communication skills, and you have problems with perseverative behaviors," and that, accordingly, the CSE made sure L.R.'s social development and communication skills were addressed in the IEP.  Tr. 205–206.

Dr. Bowser testified that the CSE also recommended related services for L.R.  Tr. 115.  The CSE included occupational therapy because Mary Holahan recommended it, and because there are "certain parts of school-related occupational therapy that could help [L.R.] with sensory issues, that could help him with self-regulation, that could keep him, so that he wouldn't be bumping into things or bumping into the other students."  Tr. 116; Tr. 157.  The CSE included speech and language therapy because it was "apparent" from L.R.'s previous IEP and from what Dr. Bowser observed that L.R. needed it.  Tr. 116–117.  And the CSE included counseling because Dr. Bowser observed that L.R. "wasn't relating well to the other teachers," "was hiding

18

under the teacher's chair when the music played," and "was having difficulties with social skills, with the other kids."  Tr. 117.  Dr. Bowser thought counseling could help L.R. with his social skills, and "if something was happening, where if somebody was bothering him or he was nervous or whatever, he could tell [a] counselor that."  Tr. 117.  Dr. Bowser also testified that if L.R. were on the autism spectrum, "counseling would have been an appropriate methodology to address his deficits and social skills."  Tr. 175.

Dr. Bowser testified that the CSE recommended a 12:1:1 placement "so that [L.R.] could get the additional support during the school day, and that he would be in a smaller class setting." Tr. 125.  She noted that L.R. was in a "smaller type class" at the Montessori School, and stated that "he needed a smaller class, where the children and the teacher . . . could interact better with each other, where he would have more opportunities."  Tr. 125; Tr. 171.  Dr. Bowser stated that in a larger class, "he might not have related the way that he should have," but "in a smaller class, the teacher and the para could have kept an eye on him and gotten him into more of the activities, kept him on task more of the time, and helped him."  Tr. 125.  In recommending the 12:1:1 class, the CSE also considered L.R.'s "problems with adaptive behavior," according to his Vineland scores, and his "intelligence quotient, which was within the low-average range."  Tr. 126.  When asked whether the CSE could have recommended a class with a smaller number of students, Dr. Bowser testified that L.R.'s intellectual functioning was too high for the next smallest class offered by the DOE (a 6:1:1 in District 75 for children with autism).  Tr. 172; Tr. 211.

When asked whether L.R. required access to a sensory gym, Dr. Bowser testified that he did not, as there was no concern about his gross motor skills:  "He participated in gymnastics outside school.  [Ms. Holahan] said he had adequate postural control.  He could independently move through the school building.  That doesn't seem like a child who would need a special

gym." Tr. 158–159.  Further, [Ms. Holahan] recommended school-based occupational therapy, "which would be done in the school building."  Tr. 159–160.  When asked whether L.R.'s adverse response to music was addressed in the IEP, Dr. Bowser responded that it would be addressed by the teacher, given that she did not know what type of kindergarten class he would be in and whether or not the teacher would play "that type of music."  Tr. 158.  When asked why the CSE did not request a speech evaluation, given L.R.'s serious language needs, Dr. Bowser stated that the CSE "felt that he was functioning the same way."  Tr. 200–201.

### F.  IHO's Findings

In a decision dated October 10, 2012, the IHO found that the DOE failed to offer L.R. a FAPE for the 2010–2011 school year.  Impartial Hearing Officer's Findings of Fact and Decision, Case No. 134339 (Oct. 10, 2012) (Doc. 1, Ex. A) ("IHO") 17.  The IHO made the determination on both procedural and substantive grounds.  *Id.*  Specifically, the IHO concluded that the IEP was not based upon sufficient evaluative material and, as a result, the IEP was not sufficiently intensive to meet L.R.'s needs.  *Id.*

The IHO found that the CSE "rush[ed] to provide an IEP without conducting the needed full evaluations."  IHO 18.  The IHO felt Dr. Bowser had good reason to suspect that L.R. had autism and found compelling Dr. Antar's testimony that it is critical to get services to autistic children as early as possible.  IHO 16.  The IHO found "problematic" the CSE's reliance on evaluations conducted almost two years earlier, given the severity of L.R.'s condition and the fact that children change rapidly, and found "very problematic" Dr. Bowser's testimony that the CSE did not conduct new evaluations because she wanted to complete the IEP before the summer, "apparently before she went away on vacation."  *Id.*  The IHO also determined that the

CSE should have taken into account Dr. Antar's evaluation, which the IHO deemed significant and current. *Id.*

Because the CSE failed to appropriately evaluate L.R., the IHO concluded, the CSE "recommended what appears to have been an inappropriate classification and program for this student." IHO 18. The IHO found that the IEP failed to address critical areas with regard to L.R.'s anxiety and social functioning and resulted in a recommended class of 12:1:1 that would have been too large for L.R. IHO 17. The IHO also found that the IEP failed to contain adequate goals for L.R., stating that the CSE erred in relying on C.R.'s assessment of whether her son's prior goals had been achieved, given that she was not a speech and language expert and speech and language was L.R.'s area of greatest difficulty. *Id.* Accordingly, the IHO determined that the DOE had not met its burden of showing that more likely than not, the program offered would have appropriately met L.R.'s needs. *Id.*[9]

By contrast, the IHO found it more likely than not that Cooke met L.R.'s needs. IHO 17–18. The IHO also found that equitable considerations supported Plaintiffs' claim for funding, deeming C.R. a "cooperative parent who worked with the DOE as best [she] could." IHO 18. The IHO thus directed the DOE to pay $44,500 to Cooke for L.R.'s attendance during the 2010–2011 school year. *Id.*

### G. SRO's Findings

The DOE appealed the IHO's decision, and Plaintiffs cross-appealed the IHO's failure to address their claims that the CSE was invalidly constituted and that the assigned placement at P.S. 151 was inappropriate. Office of State Review Appeal, No. 12-216 (Dec. 19, 2014) (Doc. 1,

---

[9] The IHO made his determination without deciding whether the CSE was improperly constituted or whether the assigned placement at P.S. 151 was inappropriate.

Ex. B) ("SRO") 5–6.[10]  On December 19, 2014, the SRO issued her decision, disagreeing with

the IHO and concluding that the DOE did offer L.R. a FAPE for the 2010–2011 school year.

SRO 22.

As to Plaintiffs' procedural challenges to the IEP, the SRO first addressed Plaintiffs'

claim that the CSE was invalidly constituted.  SRO 8–9.  The SRO noted that the absence from

the CSE of a special education teacher who would have taught L.R. arguably resulted in a

procedural violation.  SRO 8.  However, the SRO found that such a procedural violation did not

rise to the level of a denial of a FAPE, since she was not persuaded by the evidence that the

absence of such a teacher from the CSE impeded L.R.'s right to a FAPE, significantly impeded

the parents' opportunity to participate in the decision-making process, or caused a deprivation of

educational benefits.  SRO 9.

The SRO next addressed Plaintiffs' claim that the IEP was not based upon sufficient

evaluative material.  SRO 9–15.  The SRO described the documentation reviewed by the CSE

and concluded that the CSE was not required to reevaluate L.R., given that state regulations do

not require a district to reevaluate a student each year, nothing in the hearing record suggested

that L.R. was changing rapidly, and the CSE was able to confirm that much of the information

set forth in L.R.'s previous IEP was still accurate.  SRO 10–15 & nn.7, 9, 10.  The SRO further

concluded that the evaluative information available to the CSE resulted in an accurate

description of L.R.'s needs in the IEP.  SRO 9.  The SRO noted that the CSE was aware that L.R.

demonstrated behaviors characteristic of an autism spectrum disorder at the time of its meeting

and found that those behaviors were reflected in the IEP.  SRO 13–14.  The SRO found that

---

[10] Plaintiffs also cross-appealed the IHO's alleged failure to consider their claims regarding the inadequacy of the
IEP's non-speech-related goals, SRO 6, but the IHO did find that the IEP's goals in "other areas" were inadequate,
IHO 17.

although the CSE did not have access to a current speech-language report, information regarding L.R.'s speech-language functioning was available to the CSE and reflected in the IEP.  SRO 14. The SRO also found that the IEP identified L.R.'s sensory and self-regulation needs, including his attentional needs.  *Id.*

Turning to Plaintiffs' substantive challenges to the IEP, the SRO first concluded that the IEP's goals targeted L.R.'s identified areas of need, appropriately addressed those needs, and were sufficiently specific and measureable to guide instruction and to evaluate L.R.'s progress over the course of the school year.  SRO 15–17.  The SRO rejected Plaintiffs' contention that the academic goals in the IEP were not appropriate because L.R. had already achieved them, explaining that there was no indication that L.R. had met those goals at the time of the CSE meeting and that, in fact, C.R. indicated at the meeting that the goals remained appropriate.  SRO 16.  The SRO also rejected Plaintiffs' contention that the absence of goals designed to address L.R.'s anxiety contributed to a denial of a FAPE, finding that L.R. did not demonstrate anxiety at the time of the CSE meeting and, accordingly, no goals addressing anxiety were required to be included in the IEP.  *Id.*

The SRO next concluded that the CSE's decision to recommend a 12:1:1 special class placement, together with strategies to address L.R.'s management needs and the recommended related services, was reasonably calculated to enable L.R. to receive educational benefits for the 2010–2011 school year.  SRO 17–19.  Contrary to the IHO's determination that a class of 12:1:1 would have been too large for L.R, the SRO concluded that the information considered by the CSE supported the program recommendation.  SRO 18.  The SRO pointed specifically to parts of the record indicating that L.R. benefitted from verbal cues and verbal redirection and demonstrated an ability to follow routines in the classroom, independently choose which items to

play with, and transition with his peers between the classroom and playroom.  *Id.*  The SRO also pointed to Dr. Bowser's testimony that placement in a 12:1:1 special class would provide L.R. with the support he needed to perform better academically, and that such a placement met L.R.'s needs, because he would be with students who also needed additional support.  *Id.*

Finally, the SRO turned to Plaintiffs' challenges to the recommended placement at P.S. 151.  SRO 19–21.  Relying in part on the Second Circuit's decision in *R.E.*, 694 F.3d 167, the SRO concluded that Plaintiffs could not prevail on claims regarding implementation of the IEP because they rejected the assigned placement and chose to enroll L.R. in a private school prior to the time the DOE became obligated to implement the IEP.  SRO 19–20.  The SRO alternatively found, however, that the evidence in the record did not support the conclusion that the DOE would have deviated from the IEP in a material or substantial way.  SRO 21.

Having determined that the DOE satisfied its burden to establish that it offered L.R. a FAPE for the 2010–2011 school year, the SRO sustained the DOE's appeal, dismissed Plaintiffs' cross-appeal, and ordered that the IHO's decision be modified to the extent that it directed the DOE to directly fund L.R.'s tuition at Cooke for the 2010–2011 school year.  SRO 22.[11]

### H.  This Action

On April 20, 2015, Plaintiffs filed the Complaint in this action, seeking reversal of the SRO's decision.  The parties cross-moved for summary judgment, and on January 20, 2016, the motions were fully briefed.  On August 23, 2016, the Court received the administrative record, which was filed under seal.

---

[11] The SRO made her determination without deciding whether Cooke was an appropriate placement or whether equitable considerations supported Plaintiffs' requested relief.  SRO 22.

### III.  STANDARD OF REVIEW

Upon an aggrieved party's appeal of the SRO's decision to the federal district court, the court must review the entirety of the administrative record in addition to supplemental evidence upon either party's request.  20 U.S.C. § 1415(i)(2)(C)(i)–(ii).[12]  Though IDEA appeals tend to come before the district court as a motion for summary judgment, the existence of a genuine issue of material fact does not necessarily result in denial of the motion.  *See, e.g.*, *Viola v. Arlington Cent. Sch. Dist.*, 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006).  "Rather, the motion serves as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in [the] IDEA [in developing the specific IEP at issue] and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational benefits."  *M.H.*, 685 F.3d at 225–26.  "Though the parties in an IDEA action may call the procedure 'a motion for summary judgment,' the procedure is in substance an appeal from an administrative determination, not a summary judgment [motion]."  *Id*. at 226.

Courts reviewing administrative decisions under the IDEA must determine whether the decision is supported by a preponderance of the evidence.  *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380 (2d Cir. 2003).  This review is not, however, "an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review."  *Rowley*, 458 U.S. at 206.  Rather, "[t]he role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed."  *C.F.*, 746 F.3d at 77 (quoting *Gagliardo*, 489 F.3d at 112–13).  Both the Supreme Court and the Second Circuit "have interpreted the IDEA as strictly limiting judicial review of state administrative decisions."  *Grim*,

---

[12] The parties did not submit any supplemental evidence here, instead relying exclusively on the administrative record.

346 F.3d at 380–81 (citing *Rowley*, 458 U.S. at 204–08; and *Walczak*, 142 F.3d at 129).  This Court must therefore "give 'due weight' to the administrative proceedings, 'mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'"  *Id.* at 381 (quoting *Walczak*, 142 F.3d at 129).  "The standard of review 'requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete *de novo* review.'"  *C.F.*, 746 F.3d at 77 (quoting *M.H.*, 685 F.3d at 244).

As the Second Circuit has articulated, the level of deference owed by this Court to the administrative findings below must "hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive."  *M.H.*, 685 F.3d at 244.  Most critically, the "deference owed depends on both the quality of the opinion and the court's institutional competence."  *C.F.*, 746 F.3d at 77.  The Court "must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned," *R.E.*, 694 F.3d at 189, and the Court's "determination of the persuasiveness of an administrative finding must also be colored by an acute awareness of institutional competence and role," *M.H.*, 685 F.3d at 244.  Thus, for example:

> [D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures.  Decisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress.  Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not.  And the district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency.

*M.H.*, 685 F.3d at 244 (citations omitted).

Finally, courts "defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer." *Id.* at 241; *see also Matrejek v. Brewster Cent. Sch. Dist.*, 471 F. Supp. 2d 415, 426 (S.D.N.Y. 2007), *aff'd*, 293 F. App'x 20 (2d Cir. 2008) (deferring to the SRO's determination because doing otherwise would invite the court to substitute its "own uninformed judgment for the opinions of persons with far greater expertise without having any basis to do so"). "If the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision may be afforded diminished weight." *E.A.M.*, 2012 WL 4571794, at *5 (internal quotation marks omitted). However, if the district court concludes that the SRO's determinations are "insufficiently reasoned to merit that deference," the court may "consider the IHO's analysis, which is also informed by greater educational expertise than that of judges, rather than [] rely exclusively on its own less informed educational judgment." *M.H.*, 685 F.3d at 246.

## IV. DISCUSSION

The DOE asks the Court to adopt the SRO's decision in its entirety and find that the DOE offered L.R. a FAPE for the 2010–2011 school year. Defendant's Memorandum of Law in Support of Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment (Doc. 15) ("Def.'s Mem.") at 1. Plaintiffs instead ask the Court to defer to the decision of the IHO and grant their claim for tuition funding. Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment (Doc. 11) ("Pls.' Mem.") at 1. In arguing that the DOE failed to offer L.R. a FAPE, Plaintiffs challenge the standard of review applied by the SRO, the IEP (both procedurally and substantively), and the recommended placement at P.S. 151. The Court addresses each of these challenges in turn, ultimately concurring with the decision of the SRO.

27

### A.  Challenges to the SRO's Standard of Review

Plaintiffs first argue that the SRO improperly afforded the IHO no measure of deference and completely substituted her own judgment for that of the IHO.  Pls.' Mem. at 10.  However, the IDEA provides that the SRO "shall make an *independent* decision" upon completing a review of the IHO's findings and decision.  20 U.S.C. § 1415(g)(2) (emphasis added).  Thus, the SRO's review of an IHO's decision is, contrary to Plaintiffs' argument, intended to be *de novo*.  *T.L. v. N.Y.C. Dep't of Educ.*, 938 F. Supp. 2d 417, 431 (E.D.N.Y. 2013); *M.W. v. N.Y.C. Dep't of Educ.*, 869 F. Supp. 2d 320, 330 (E.D.N.Y. 2012).  The situation here is simply the commonplace occurrence where the IHO and SRO reviewed the same record and testimony and drew different conclusions.  This does not mean that the SRO improperly ignored the IHO's determinations, or that the SRO's review was not thorough and careful, *R.R. ex rel. M.R. v. Scarsdale Union Free Sch. Dist.*, 366 F. App'x 239, 242 (2d Cir. 2010), and it is not a basis for the Court to put aside the SRO's decision, given that the SRO clearly explained the basis for her conclusions, *Walczak*, 142 F.3d at 129.

### B.  Procedural Challenges

Plaintiffs next challenge the procedural adequacy of the IEP.  In determining whether an offered IEP is adequate, courts first examine whether the state has complied with the procedures mandated by the IDEA.  *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009).  This inquiry is "no mere formality," since "adequate compliance with the procedures prescribed w[ill] in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP."  *Walczak*, 142 F.3d at 129.  At the same time, not "every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA."  *A.C.*, 553 F.3d at 172.  A procedural violation renders an IEP

legally inadequate only when the violation (1) "impeded the child's right to a [FAPE],"
(2) "significantly impeded the parents' opportunity to participate in the decisionmaking process
regarding the provision of a [FAPE]," or (3) "caused a deprivation of educational benefits."
*E.A.M.*, 2012 WL 4571794, at *6 (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)); *see also Werner v.
Clarkstown Cent. Sch. Dist*., 363 F. Supp. 2d 656, 659 (S.D.N.Y. 2005) (finding that procedural
violations "do not automatically require a finding of a denial of a FAPE.").

Here, Plaintiffs allege two procedural violations:  (1) that the CSE failed to fully evaluate
L.R. or to consider sufficient, appropriate, evaluative material in developing his IEP; and (2) that
the CSE was invalidly constituted.  Pl.'s Mem. at 11–19.  In opposition, the DOE asserts that, as
the SRO found, the evaluative materials on which the CSE relied were sufficient to develop a
program that offered L.R. a FAPE.  Def.'s Mem. at 10–17.  The DOE concedes that the CSE was
invalidly constituted, but argues that the SRO was correct in finding that this procedural
violation did not render the IEP legally inadequate.  *Id.* at 11–12, 17–19.  The DOE further
argues that in crafting the IEP, the CSE procedurally complied with other state and federal
mandates.  *Id.* at 12.

### 1.  Sufficiency of the Material Reviewed by the CSE

When developing a student's IEP, the CSE must review "existing evaluation data on the
child, including (i) evaluations and information provided by the parents of the child; (ii) current
classroom-based, local, or State assessments, and classroom-based observations; and
(iii) observations by teachers and related service providers."  20 U.S.C. § 1414(c)(1)(A); *see* 8
N.Y.C.R.R. § 200.4(b)(5)(i).  "[O]n the basis of that review, and input from the child's parents,"
the CSE must then "identify what additional data, if any, are needed to determine," among other
things, "the educational needs of the child," "the present levels of academic achievement and

related developmental needs of the child," and "whether the child needs special education and

related services."  20 U.S.C. § 1414(c)(1)(B); *see* 8 N.Y.C.R.R. § 200.4(b)(5)(ii).  If the CSE

determines that "no additional data are needed to determine . . . the child's educational needs,"

the district is not "required to conduct such an assessment unless requested by the child's

parents."  20 U.S.C. § 1414(c)(4); *see* 8 N.Y.C.R.R. § 200.4(b)(5)(iv).  In other words, "[a]ny

additional assessments need only be conducted if found necessary to fill in gaps in the initial

review of existing evaluation data."  *D.B. ex rel. E.B. v. N.Y.C. Dep't of Educ.*, 966 F. Supp. 2d

315, 329–30 (S.D.N.Y. 2013); *see also T.F. ex rel. M.F. v. N.Y.C. Dep't of Educ.*, No. 14 Civ.

3401 (WHP), 2015 WL 5610769, at *4 (S.D.N.Y. Sept. 23, 2015).  Unless the CSE identifies

such a "gap," or the parents and district agree otherwise, the IDEA requires only that a child with

a disability be evaluated at least once every three years, and not more frequently than once a

year.  20 U.S.C. § 1414(a)(2)(B); 8 N.Y.C.R.R. § 200.4(b)(4); *see D.B.*, 966 F. Supp. 2d at 329.

Plaintiffs argue that because of its concern that L.R. was autistic, the CSE should have

conducted new evaluations before finalizing the IEP.  Pls.' Mem. at 14–15.  On this point,

however, the Court defers to the well-reasoned decision of the SRO.  The SRO thoroughly

assessed the documentation reviewed by the CSE and concluded that, based on this

documentation, the CSE was able to sufficiently determine L.R.'s levels of performance and

needs.  SRO 9–15.

The SRO explained that, even without a formal diagnosis, the CSE was "aware that

[L.R.] demonstrated behaviors that were characteristic of an autism spectrum disorder and

included them in the description of the student in the April 2010 IEP."  SRO 13–14.  For

example, the IEP "identified the student's social difficulties related to interpersonal relations,

play and leisure skills, including that he did not yet imitate complex actions several hours after

30

watching someone else perform them, demonstrate friendship-seeking behavior with others of the same age, have a best friend or show preference for certain friends, choose to play with other children, play cooperatively with one or more children for up to five minutes, or play simple make-believe games with others."  SRO 14 (citing Ex. 4-5).  The IEP also included that L.R. "received a score in the clinical range on the Pervasive Developmental Problems scale of the CBCL," *id.*, a disorder the IHO noted was "often referred to as the autistic spectrum," IHO 6.

The SRO also explained why it was permissible for the CSE to rely on L.R.'s prior evaluations and IEP.  First, "State regulations do not require a district to reevaluate a student each year but rather dictate that a student be evaluated at least every three years."  SRO 13 n.7.  Second, because the CSE had two recent classroom observations and input from L.R.'s parent and teacher, the CSE was able to confirm that "much of the description of the student set forth in his previous August 2009 IEP continued to be accurate at the time of the April 2010 CSE meeting."  *Id.*; *see* SRO 14 n.9, 15 n.10.

Plaintiffs argue that if the CSE had conducted new evaluations, L.R.'s "anxieties" could have been identified and addressed in the IEP.  Pls.' Mem. at 13.  Plaintiffs' assertion is belied by the fact that Dr. Antar, who evaluated L.R. less than two months after the CSE meeting, also omitted any reference to "anxieties" in her report.  Ex. I.  Moreover, the IEP did recommend counseling, which Dr. Bowser noted could address L.R.'s fear of music and difficulties with teachers and other students.  Tr. 117; Ex. 2-4.  Thus, even if the IEP failed to explicitly identify L.R.'s anxiety, the Court finds that this omission did not amount to the denial of a FAPE.

Having reviewed the record, the Court upholds the analysis of the SRO.  As the SRO found:

> [T]he evidence in the hearing record indicates that in developing the student's April 2010 IEP, the April 2010 CSE considered and relied upon the results of the

student's most recent evaluation (a March 2010 OT school function evaluation), a
parent survey, and a classroom observation report, from which it gleaned
information regarding the student's strengths; the parent's concerns; and the
academic, developmental and functional needs of the student—as described in the
evaluative information available to the April 2010 CSE—consistent with
regulations.

SRO 15.  Plaintiffs fail to demonstrate that the evaluative materials were inadequate or that the

purported procedural errors would have changed the CSE's conclusion.  *See T.F.*, 2015 WL

5610769, at *4.  Instead, the preponderance of the evidence indicates that the CSE had sufficient

and accurate information to understand and describe L.R.'s levels of performance and needs.

## 2. Composition of the CSE

Plaintiffs also argue that the IEP was invalid because the CSE did not include a special

education teacher who satisfied the procedural requirements of the IDEA.  Pls.' Mem. at 17.  The

CSE must include, among others, at least one of the student's special education teachers or

providers or, if the student is participating in the regular education environment, at least one of

the student's regular education teachers.  8 N.Y.C.R.R. § 200.3(a)(1)(ii)–(iii); *K.C. ex rel. C.R. v.

N.Y.C. Dep't of Educ.*, No. 14 Civ. 836 (RJS), 2015 WL 1808602, at *7 (S.D.N.Y. Apr. 9, 2015);

*see also* 20 U.S.C. § 1414(d)(1)(B).  It is undisputed that the CSE failed to include any of L.R.'s

teachers from the Montessori School.  The Court thus finds that the CSE was improperly

constituted.

Plaintiffs argue that this procedural violation "deprived the team of critical information

regarding L.R.'s current functioning and of input essential to developing an appropriate IEP."

Pls.' Mem. at 18.  However, as explained above, the preponderance of the evidence indicates that

the CSE had sufficient and accurate information to understand and describe L.R.'s levels of

performance and needs, even without the participation of one of L.R.'s teachers.  Moreover, the

two recent classroom observations, Dr. Bowser's discussion with L.R.'s teacher, and the

participation of L.R.'s mother "enabled the CSE to obtain student-specific information, and the participation of [Ms. Bizzarri, a district special education teacher,] provided expertise in the district's special education offerings."  *A.M. v. N.Y.C. Dep't of Educ.*, 964 F. Supp. 2d 270, 280 (S.D.N.Y. 2013).  The Court thus agrees with the SRO that this technical violation concerning the composition of the CSE did not impede L.R.'s right to a FAPE, significantly impede C.R.'s opportunity to participate in the decision-making process, or cause a deprivation of educational benefits.  SRO 9.

### C. Substantive Challenges

Plaintiffs also challenge the substantive adequacy of the IEP.  An IEP is substantively adequate if it "provide[s] personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction."  *D.D-S. v. Southold Union Free Sch. Dist.*, 09 Civ. 5026 (JS) (WDW), 2011 WL 3919040, at *11 (E.D.N.Y. Sept. 2, 2011) (quoting *Rowley*, 458 U.S. at 203), *aff'd*, 506 F. App'x 80 (2d Cir. 2012).  As stated above, the IEP must be "reasonably calculated to enable the child to receive educational benefits," "likely to produce progress, not regression," and afford the student with an opportunity to achieve greater than mere "trivial advancement."  *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192, 195 (2d Cir. 2005) (quoting *Walczak*, 142 F.3d at 129–30).  Furthermore, there is "a strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers."  *Walczak*, 142 F.3d at 122 (internal quotation marks omitted).  However, a school district is not required to provide "every special service necessary to maximize each handicapped child's potential," *Cerra*, 427 F.3d at 195, or "everything that might be thought desirable by loving parents," *Walczak*, 142 F.3d at 132.

When deciding whether a school district has met its obligations under the IDEA, a court "must examine the record for any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan." *Cerra*, 427 F.3d at 195 (internal quotation marks omitted). A court cannot choose, however, between the competing views of experts on matters of educational policy or substitute its own judgment for that of the hearing officers which it reviews. *Id.* (citing *Briggs v. Bd. of Educ. of Conn.*, 882 F.2d 688, 693 (2d Cir. 1989)). Questions of an IEP's substantive adequacy are thus ones in which "substantial deference is owed to the judgments of state administrative officers." *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 450 (2d Cir. 2015) (citing *Cerra*, 427 F.3d at 191). "[C]ourts lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Id.* (quoting *Rowley*, 458 U.S. at 208); *see also Cerra*, 427 F.3d at 195 ("Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy."); *Grim*, 346 F.3d at 382 ("[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of administrative officers.").

Here, Plaintiffs raise three substantive challenges to the IEP: (1) that the IEP failed to fully and accurately reflect L.R.'s then-current levels of performance and needs; (2) that the IEP goals were inappropriate and insufficient for L.R.; and (3) that a 12:1:1 class was too large for L.R. Pls.' Mem. at 20–26. In opposition, the DOE argues that, as the SRO found, the IEP was substantively adequate, as it was reasonably calculated to enable L.R. to receive educational benefits. Def.'s Mem. at 19–27.

### 1. Accuracy of the Levels of Performance and Needs

Plaintiffs argue that the IEP failed to fully and accurately reflect L.R.'s then-present

levels of performance and individual needs, as is required by the IDEA.  Pls.' Mem. at 20–21;

*see* 20 U.S.C. § 1414(d)(1)(A)(i); 8 N.Y.C.R.R. § 200.4(d)(2)(i).  Specifically, Plaintiffs assert

that the IEP "does not give any academic functioning or instructional levels for L.R.," the

"description of L.R.'s current social/emotional performance" is insufficient, and the IEP fails to

reflect, among other things, L.R.'s anxieties or behaviors typical of autism (spinning,

perseverative behaviors, withdrawal, adverse reaction to music, not using language

appropriately).  Pls.' Mem. at 20–21.[13]

As the SRO noted, "while the CSE is required to consider recent evaluative data in

developing an IEP, so long as the IEP accurately reflects the student's needs[,] the IDEA does

not require the CSE to exhaustively describe the student's needs by incorporating into the IEP

every detail of the evaluative information available to it."  SRO 10; *see Z.A. ex rel. D.A. v.*

*N.Y.C. Dep't of Educ.*, No. 15 Civ. 1539 (KPF), 2016 WL 4766340, at *17 (S.D.N.Y. Sept. 13,

2016).  Even so, the SRO explained, in detail, how the IEP accurately described L.R.'s

social/emotional, speech-language, sensory, self-regulation, attentional, and academic issues, in

stark contrast to Plaintiffs' claim that this information was inadequate.  SRO 13–15.  Indeed, as

discussed above, the CSE considered extensive materials from a variety of sources to identify

---

[13] Plaintiffs argue for the first time in their reply brief that the IEP also failed to recommend State-mandated counseling and training for parents of students classified as autistic.  Reply Memorandum of Law in Support of Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment (Doc. 16) ("Pls.' Reply Mem.") at 3–4 (citing 8 N.Y.C.R.R. § 200.13).  Plaintiffs may not now rely on objections that were not included in their Due Process Complaint.  *See* 20 U.S.C. § 1415(f)(3)(B); *D.B. ex rel. E.B. v. N.Y.C. Dep't of Educ.*, 966 F. Supp. 2d 315, 328 (S.D.N.Y. 2013) ("The scope of the inquiry of the IHO, and therefore also of the SRO and this Court, is limited to matters either raised in the plaintiffs' [] Due Process Complaint or agreed to by the defendant.").  In any event, "failure to provide [such] counseling ordinarily does not result in a FAPE denial or warrant tuition reimbursement."  *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 170 (2d Cir. 2014).

L.R.'s levels of performance and needs.  "Given the SRO's detailed engagement with the record and thorough recounting of the manner in which [L.R.'s] challenges and needs were addressed, the Court defers to the SRO's expertise in determining that the IEP was substantively adequate." *Z.A.*, 2016 WL 4766340, at *17.

### 2.  Sufficiency of the Goals

Pursuant to the IDEA and relevant state regulations, an IEP must contain measurable annual goals, both academic and functional, along with the method used to measure the student's progress toward those goals, including how and how often such progress will be measured.  20 U.S.C. § 1414(d)(1)(A)(i); 8 N.Y.C.R.R. § 200.4(d)(2)(iii).  The SRO explained, in detail, how the "annual goals in the April 2010 IEP targeted the student's identified areas of need, appropriately addressed the student's needs, and were sufficiently specific and measurable to guide instruction and to evaluate the student's progress over the course of the school year."  SRO 16–17.  Specifically:

> [W]ith regard to the speech-language domain, the April 2010 IEP contained four annual goals with three corresponding short-term objectives for each of these goals, that addressed the student's needs related to vocabulary development, appropriate sentence structure, auditory processing skills (retaining and following two-step verbal directions), and responding appropriately to questions.  To address the student's fine motor deficits, the April 2010 IEP included one annual goal that focused on increasing the student's prewriting and handwriting skills and one annual goal to address the student's ADL skills.  To address the student's emerging academic skills, the April 2010 IEP included one annual goal to increase the student's cognitive skills with three corresponding short-term objectives that focused on the student's ability to identify shapes, understand positional concepts (i.e., on top of, under), and recognize letters and numbers.  To address the student's attending deficits, another annual goal addressed increasing his ability to remain on tabletop tasks or lessons for extended periods of time. . . . With regard to the student's deficits in the social/emotional domain, the April 2010 IEP included two annual goals, the first which addressed increasing the student's ability to participate during group play/work including sharing group roles, taking turns, using eye contact and performing as an active member of a group while maintaining personal boundaries, which would also address the student's social skills and the second which addressed increasing the student's

social skills including decreasing his mouthing of objects, attending to tasks on
initial directive and engaging in group play.

SRO 16 (citations omitted).

Plaintiffs argue that certain IEP goals were inadequate, because they were photocopied

from the prior year's IEP, without an independent evaluation or input from L.R.'s speech-

language therapist or classroom teacher as to whether L.R. had already met the goals or whether

they continued to be appropriate for him.  Pls.' Mem. at 22.  As the SRO concluded, however,

information regarding L.R.'s levels of functioning was available to the CSE.  SRO 14.  Dr.

Bowser testified that the CSE knew the prior goals were still appropriate, because they went over

every goal with L.R.'s mother, who affirmed that the goals had not yet been met.  Tr. 118–120;

Tr. 128–130; 168–170.  Moreover, Dr. Bowser testified that "you need parent input in the goals,"

that a child's parent is one of the "best indicators of whether or not those goals have been

achieved," and that she thought C.R. provided reliable input for the goals on L.R.'s IEP.  Tr. 186.

The SRO did not, as Plaintiffs maintain, erroneously ignore testimony from L.R.'s teacher at

Cooke indicating that L.R. had already achieved the academic goals in the IEP by the start of the

2010–2011 school year.  *See* Tr. 255–256.  As the SRO correctly noted, such testimony was not

before the CSE, and there is no indication in the record that *at the time of the CSE meeting*, L.R.

had achieved those goals.  SRO 16; *see also R.E.*, 694 F.3d at 186 (holding that an "IEP must be

evaluated prospectively as of the time of its drafting"); *D.A.B. ex rel. D.B.*, 973 F. Supp. 2d 344,

361 (S.D.N.Y. 2013) ("[A] substantively appropriate IEP may not be rendered inadequate

through testimony and exhibits that were not before the CSE about subsequent events and

evaluations that seek to alter the information available to the CSE.").

Plaintiffs also argue that the IEP failed to include any goals to address L.R.'s anxiety,

counseling, or social skills issues.  Pls.' Mem. at 23.  The IEP did include counseling and social

skills goals, as the SRO described and as Dr. Bowser explained.  SRO 16 (citing Ex. 4-12 to 4-13); Tr. 129 (explaining that she "put [the social skills goal] in as a counseling goal . . . so that he has someone to help him work specifically on those goals").  In addition, as the SRO concluded, L.R. "did not demonstrate anxiety at the time of the April 2010 CSE meeting and accordingly, no goals addressing anxiety were included or required to be included in the IEP."  SRO 16.  In any event, because the IEP recommended counseling, the failure to include a goal specifically to address L.R.'s purported anxieties did not amount to the denial of a FAPE.

In sum, the Court concurs with the SRO's thorough and reasoned judgment that the goals included in the IEP were substantively appropriate and adequate to address L.R.'s needs.  *See Z.A.*, 2016 WL 4766340, at *18; *see also Grim*, 346 F.3d at 382 ("[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers.").

### 3.  Propriety of the 12:1:1 Class Recommendation

Plaintiffs argue that the 12:1:1 class recommendation was inappropriate because L.R. needed more significant individual attention from a trained teacher than could have been provided in a 12:1:1 program.  Pls.' Mem. at 24–26.  Plaintiffs raise a number of challenges on this issue, none of which are persuasive.

First, Plaintiffs argue that the CSE's decision to recommend a 12:1:1 class was inappropriately made through a "process of elimination" rather than a "belief that a 12:1:1 class was an appropriate program for L.R."  *Id.* at 23.  Plaintiffs rely principally on Dr. Bowser's supposed testimony that "she could not have recommended a class with a smaller number of

students because the only program on the continuum[14] with fewer than twelve students was 'a 6:1:1 in District 75 for children with autism.'" *Id.* at 24 (citing Tr. 172–174).  Plaintiffs insinuate that the CSE would have recommended a 6:1:1 class but for the fact that the only such class offered by the district was for children with autism and the CSE failed to fully evaluate L.R. to obtain a proper diagnosis.  *See id.*  However, Plaintiffs misrepresent Dr. Bowser's testimony. Dr. Bowser testified clearly that the CSE ruled out the 6:1:1 class not because they lacked an autism diagnosis, but because L.R.'s "intellectual functioning . . . [was] too high for that class." Tr. 172.  Moreover, although the CSE considered (and rejected) the 6:1:1 class, nothing in the record indicates that the CSE believed a 12:1:1 class would have been inappropriate.  Instead, contrary to Plaintiffs' assertion, Dr. Bowser testified that the CSE recommended the 12:1:1 class because they "thought that the 12:1:1 would be an appropriate placement for him."  Tr. 125–126; *see also* Tr. 171–172.

Next, Plaintiffs argue that the 12:1:1 recommendation was inappropriate because L.R. was in a preschool class of nine students and two teachers, and "there was nothing to indicate that his behaviors would improve in a class with more students and fewer teachers."  Pls.' Mem. at 24.  Even if L.R. would have made more improvement in a class with fewer students, the DOE is not required to provide "every special service necessary to maximize each handicapped child's potential," *Cerra*, 427 F.3d at 195, or "everything that might be thought desirable by loving parents," *Walczak*, 142 F.3d at 132.  Had the CSE observed that L.R.'s needs were not being met in his preschool environment, one could properly question the decision to place him in an even larger class.  The record here, however, lacks any such indication.

---

[14] Pursuant to the IDEA's implementing regulations, school districts are required to "ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services."  34 C.F.R. § 300.115(a).

Finally, Plaintiffs argue that the SRO erred in relied "exclusively" on Dr. Bowser's testimony and New York State Regulations defining a 12:1:1 class,[15] while ignoring contrary testimony from Dr. Antar and individuals at Cooke.  Pls.' Mem. at 24–25.  Even assuming the SRO had an obligation to consider such retrospective testimony regarding L.R.'s needs, the SRO did not rely exclusively on those sources.  The SRO noted that "at the time of the April 2010 CSE, information reflected in the April 2010 classroom observation supported the program recommendation," including L.R.'s ability to follow routines in the classroom and independently choose items to play with.  SRO 18 (citing Ex. 9-3).  The SRO also noted that L.R. "was able to benefit from verbal cues and verbal redirection and also demonstrated [an] ability to transition with his peers in line, for example, to the playroom."  *Id.*

After a careful review of the record, as well as Dr. Bowser's testimony and the New York State Regulations, the SRO deemed the 12:1:1 placement appropriate, finding that, "in light of the student's academic, language, social/emotional, fine motor, attentional, and sensory regulation needs, the April 2010 CSE's decision to recommend a 12:1+1 special class placement in a community school, together with the strategies to address the student's management needs and the recommended related services, was reasonably calculated to enable the student to receive educational benefits for the 2010-11 school year."  SRO 19.  The Court defers to the SRO's reasoned conclusion.  *See L.R. ex rel. L.R. v. N.Y.C. Dep't of Educ.*, No. 15 Civ. 1542 (FB) (RML), 2016 WL 3390413, at *3 (E.D.N.Y. June 20, 2016) ("[C]onsiderations of appropriate class size are matters of educational policy on which courts should afford greater deference to administrative findings.") (citing *M.H.*, 685 F.3d at 244); *F.O. ex rel. Brendan O. v. N.Y.C. Dep't*

---

[15] Those regulations provide that a 12:1:1 class placement may be appropriate for students "whose management needs interfere with the instructional process, to the extent that an additional adult is needed within the classroom to assist in the instruction of such students."  8 N.Y.C.R.R § 200.6(h)(4)(i).

*of Educ.*, 976 F. Supp. 2d 499, 511 (S.D.N.Y. 2013) ("[C]lass size and instructional

programming are matters of educational policy concerning which courts defer to a state

administrative officer."); *see also Z.A.*, 2016 WL 4766340, at *19 (deferring to SRO).

### D.  Placement Challenges

Plaintiffs contend that the SRO misconstrued the law in evaluating their challenges to the

placement at P.S. 151.  Pls.' Mem. at 26–29.  Specifically, in setting out the relevant law, the

SRO stated that "if it becomes clear that the student will not be educated under the proposed IEP,

there can be no denial of a FAPE due to the failure to implement the IEP."  SRO 19.  Finding

that L.R.'s parents rejected the placement before the DOE became obligated to implement the

IEP, the SRO concluded that Plaintiffs' challenges to the placement were speculative.  SRO 19–

20.

The Second Circuit has recently clarified that the law "does not foreclose all prospective

challenges to a proposed placement school's capacity to implement a child's IEP."  *M.O.*, 793

F.3d at 244.  To be sure, "[s]peculation that the school district will not adequately adhere to the

IEP is not an appropriate basis for unilateral placement."  *R.E.*, 694 F.3d at 195.  However, it is

not speculative to "prospectively challenge a proposed placement school's *capacity* to implement

a child's IEP."  *M.T. ex rel. H.T. v. N.Y.C. Dep't of Educ.*, No. 14 Civ. 10124 (GHW), 2016 WL

1267794, at *6 (S.D.N.Y. Mar. 29, 2016) (emphasis added).  "To conclude otherwise would

require parents to send their child to a facially deficient placement school prior to challenging

that school's capacity to implement their child's IEP, which is 'antithetical to the IDEA'[s]

reimbursement process.'"  *M.O.*, 793 F.3d at 244–45 (quoting *V.S. ex rel. D.S. v. N.Y.C. Dep't of

Educ.*, 24 F. Supp. 3d 295, 300 (E.D.N.Y. 2014)).

Although Plaintiffs are correct that the SRO erroneously stated the law, none of Plaintiffs' challenges properly implicate P.S. 151's capacity to implement the IEP.  Plaintiffs argue that the placement was inappropriate because the 12:1:1 class was too large and because the school did not have a fully equipped sensory gym.  Pls.' Mem. at 29–31.  These are impermissible "substantive attacks on [L.R.'s] IEP that were couched as challenges to the adequacy of [P.S. 151]."  *M.O.*, 793 F.3d at 245; *see Z.A.*, 2016 WL 4766340, at *21 (rejecting similar challenges).

Plaintiffs also argue that a class of only four students would have been too restrictive for L.R., and that L.R. would not have been suitably grouped with students having similar individual needs.  Pls.' Mem. at 29–30.  Such assertions "fall squarely within the category of impermissible challenges," as they are based on a presumption that the DOE would fail to adhere to the IEP and comply with regulations that require that L.R. be placed with students of similar academic, social, physical, and developmental needs.  *E.P. ex rel. B.G. v. N.Y.C. Dep't of Educ.*, No. 15 Civ. 606 (RA), 2016 WL 3443647, at *9 (S.D.N.Y. June 10, 2016) (rejecting a challenge based on the child's prospective peers being less verbally advanced); *see also M.T.*, 2016 WL 1267794, at *13 (holding that a challenge based on class composition was speculative because it "may change depending on fluctuations in enrollment, and on other parents of students with IEPs who are making their own placement decisions").

Because none of Plaintiffs' placement challenges are permissible, "the school district did not have the burden to produce evidence demonstrating [P.S. 151's] adequacy in response to these arguments."  *M.O.*, 793 F.3d at 245.

### E. Placement at Cooke and Equitable Considerations

The Court finds that the SRO correctly determined that the DOE provided L.R. a FAPE. Accordingly, the Court need not decide whether Cooke was appropriate, or whether equitable considerations favor Plaintiffs' request for tuition reimbursement. *See M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 66 (2d Cir. 2000) ("If the challenged IEP was adequate, the state has satisfied its obligations under the IDEA and the necessary inquiry is at an end.").

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is DENIED and the DOE's motion for summary judgment is GRANTED. The Clerk of the Court is respectfully directed to terminate the motions (Docs. 10 & 14) and to close this case.

It is SO ORDERED.

Dated:     September 30, 2016
           New York, New York

                                          Edgardo Ramos, U.S.D.J.